THE STATE OF CONNECTICUT *vs.* CARLETON SEARLES.

Third Judicial District, Bridgeport, April Term, 1931.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued April 15th—decided June 1st, 1931.

*Harry Silverstone,* Acting Public Defender, for the appellant (the accused).

*William H. Comley,* State's Attorney, with whom, on the brief, was *Lorin W. Willis,* for the appellee (the State).

AVERY, J. The information in three counts charges assault with intent to commit murder. In the first

count, the accused was charged with shooting a police officer, Wilbur Simpson, at Danbury, September 19th, 1930. In the second, he was charged with shooting Police Officer Healey at Greenwich, November 22d, 1930. In the third, he was charged with shooting Police Officer Teufel also at Greenwich a little later on the same day.

At the trial, the State claimed to have proved, as to the first count, these facts: About three-thirty in the morning, September 19th, 1930, Officer Simpson, while on patrol duty in Danbury, heard a noise in a yard at the rear of a store. Accompanied by Officer Schulze, he entered the yard and found there a Ford sedan. Turning a searchlight upon the automobile, he saw the accused seated behind the driving wheel who, on being asked his name, where he was from, and what he was doing, said he was from Stamford. The officer stepped to the front of the car to observe the registration numbers, and seeing they were not numbers issued in Stamford, returned to the door and engaged the accused in further conversation. Meanwhile Officer Schulze noticed, in the automobile leaning against the seat, a shotgun and rifle, and ordered the accused to hand them out to him, which was done. The shotgun was a Remington twelve gauge automatic with four or five fully loaded shells therein. The rifle was a .38 caliber repeater with five or six shells loaded with ball therein. Officer Simpson stepped around the rear of the car to the right-hand door, which was open, reached in and placed a handcuff on the right wrist of the accused, and ordered him to get out of the car, the officer holding in his left hand the other part of the handcuff. When partly out, while one foot was on the running board, the accused, with a revolver held in his left hand, fired a shot at the officer. The latter, having the flashlight in his right

hand, and observing the quick motion of the accused, struck with the flashlight at his left hand holding the revolver. The shot hit the end of the finger of the officer's left hand holding the handcuff attached to the right wrist of the accused. The latter immediately pulled away and ran out of the alley leading from the yard; and, when five or six feet distant, fired another shot which took effect in the door of the automobile near which the officer was standing, and then made his escape. A companion of the accused was nearby the automobile while these incidents occurred. The two had just burglarized the building; and in the rear of the automobile, covered with a blanket, was a large quantity of merchandise taken from the store, including, among other things, a number of shotguns, rifles, revolvers and automatic pistols, with about fifteen hundred rounds of ammunition therefor. The accused, at the trial, took the witness stand on his own behalf and admitted shooting Officer Simpson, but claimed the latter did not strike the revolver with his searchlight when the first shot was fired, and that it was fired at the officer's hand to enable the accused to get away, and with no intention of inflicting serious injury. He further claimed that the second shot was fired into the ground, and was not intended to, and did not, hit anyone.

As to the second and third counts, the State claimed to have shown that early in the forenoon of November 22d, 1930, the accused, with a companion named Morgan, was traveling toward New York on the Boston Post Road in a Cadillac automobile, which he had stolen in New Haven the preceding evening. Previously, he had stolen another Cadillac which bore Louisiana registration numbers; and, after leaving New Haven and before reaching Milford, had removed the registration numbers issued by the State of Ohio,

and placed upon the automobile numbers issued by the State of Louisiana removed from the other car. While driving in the town of Darien, the accused was seen by two police officers patrolling the road. Observing the Louisiana numbers upon the car, and having been advised to be on the lookout for a Cadillac bearing such registration, these Darien police officers pursued him, but he succeeded in escaping. In the town of Greenwich, William F. Pyne, a motor-cycle officer of the Greenwich police department, patrolling the road, who had been advised to be on the lookout for a Cadillac bearing Louisiana markers, met the accused and turned and pursued him. The latter, while being so pursued, drove the car upward of seventy miles an hour, attaining the highest rate of speed with which he was able to operate it. Officer Pyne, while pursuing the accused, twice came alongside and ordered him to stop, but he did not obey the officer's command, continuing on. Officer Pyne then fired four shots at the rear of the car, endeavoring to puncture the gasoline tank. These shots, however, took effect in a spare tire mounted on the rear, and in the rear fender. While the officer was pursuing and was behind approximately one hundred feet, through the window in the rear of the car he saw the accused discharge a revolver in his left hand over his right shoulder in an endeavor to shoot the officer through the window. This shot, however, took effect in a cushion in the back of the rear seat. While being pursued, the accused inquired of his companion, Morgan, also armed, if he knew how to use his gun, and told Morgan to "Use it if you have to." Succeeding in escaping from Officer Pyne, the accused continued on, until required to stop at an intersecting street where traffic was crossing. James Healey, a traffic officer of Greenwich, was doing duty at this point. An auto-

mobile had come to a stop at this intersection and the accused stopped behind and close to it, and endeavored to get into such a position as to hide his car, or its registration markers, from the observation of Officer Healey. The latter, who was on the lookout for a Cadillac bearing Louisiana registration numbers, and seeing that they were the numbers for which he was looking, drew his revolver and stepped to the side of the car, close to the door opposite the driver's seat. The window was down. Holding his revolver in his right hand in front and fairly close to his chest, the officer laid the barrel over the window sill in the door at the driver's seat, and ordered the accused to move over to the side of the street. The latter said, "All right; I will move over"; but with his right hand immediately whipped around a revolver and fired point blank at the officer who was only about two feet distant. The bullet wounded the fore and middle fingers and thumb of Officer Healey's right hand, where they came together in gripping his revolver, and knocked it out of his hand and into the street. Another automobile, just coming up, passed over the revolver, rendering it impossible to regain it. The officer, thus disarmed, moved somewhat toward the rear of the car and bent down to shield himself. The accused immediately fired two more shots at the officer, one of which took effect in the casing of a window of a bank about eighteen feet distant. At this time, the officer was about twelve feet from the accused, who thereupon started his car in motion and escaped. After driving some nine or ten blocks, he and his companion abandoned the car and proceeded through a side street on foot, and took shelter in a piece of woods. They were pursued by three officers, two of whom were wearing police uniforms with badges thereon, one being dressed in citizen's clothes. When the officers

approached and were about seventy-five feet distant, the accused placed his revolver to the right side of his head, feigning suicide, as he afterward testified. Officer Teufel, who was in citizen's clothes, said to the other officers, "Let's take him before he commits suicide," which was heard by the accused and, as the officers approached nearer, he immediately began shooting at them, and they returned the fire, both sides taking shelter behind trees. Several shots were exchanged and Officer Teufel was wounded in the right leg about eight inches above the knee by one of the shots fired by the accused. This exchange of shots was heard by two other police officers who had come into the woods from another direction, and who immediately hurried to the location from which the noise proceeded. The accused, observing their approach, hurried over a stone wall, and crouched behind it, and placing his left forearm upon the top, with his right hand resting his revolver upon his left forearm, took aim at the head of Officer Burke (one of the two officers who had come into the woods from the opposite direction). Officer Burke at this time was taking shelter behind a rock, and fired his revolver at the accused, the shot taking effect in the left forearm of the latter, who thereupon gave up further shooting and was placed under arrest.

At the trial, the accused testified that the shot which he fired at Officer Healey was fired at the revolver in the latter's hand, and that the other shots were fired into the ground. He further testified that the shot which struck Officer Teufel was fired low to disable the officer and enable the accused to effect his escape. His claim was that none of the shots fired at any of the police officers was intended to do them serious bodily harm, but were fired to disarm them and enable him to effect his escape.

At the close of the evidence, the court gave adequate instructions to the jury as to the law of the case and the different verdicts which could be rendered by them under each count of the information; and, after retiring, the jury returned into court, when the following occurred: "CLERK: Gentlemen of the jury, have you agreed upon a verdict? FOREMAN: We have. CLERK: Carleton Searles stand up please, look upon the foreman, Mr. Foreman look upon the prisoner. Is the prisoner guilty or not guilty of the crime whereof he stands informed against on the first count? FOREMAN: Not guilty on the first count, on the second, guilty of assault with intent to kill, on the third, not guilty. THE COURT: What was that? FOREMAN: On the third count, doesn't that include them all? THE COURT: I don't understand your answer to include an assault with intent to kill— FOREMAN: Well we— THE COURT: On each count? CLERK: You say the prisoner at the bar is guilty of assault with intent to kill on each of three counts of the information, and so say you all? THE JURY: Yes. ONE JURYMAN: I beg to say I don't understand. We found him guilty of one thing, guilty of assault with intent to kill. THE COURT: On three counts, on each of the counts? ONE JURYMAN: We didn't consider the third, being guilty of assault, of aggravated assault, we didn't consider that at all. THE COURT: You should retire and consider the charge upon each of the three counts. ONE JURYMAN: I don't think my brother understands it, we had three verdicts which we could render— THE COURT: On each count. JURYMAN: He is referring to the third verdict, not the counts in the indictment. THE COURT: You may be seated, gentlemen. I think you have misunderstood the instruction which I gave you earlier. There are three counts in this information, and as I said to you in my instruc-

tions, the clerk would inquire of you as to how you found the accused upon each count. First, upon the first count, whether or not you found him guilty as charged in the information, or guilty of one of the lesser offenses. Also he would inquire of you as to the second count whether you found him guilty as charged in the information, or guilty of one of the lesser offenses, and the same also applied to the third count. I think maybe I should reiterate to you a portion of the instructions which I gave you earlier." Thereafter, the court repeated to the jury its instructions as to the crime of assault with intent to commit murder, charged in each count of the information, and the lesser crimes of assault with intent to kill, and aggravated assault included in the charge of the greater crime, and informed them as to the different verdicts which could be rendered on each count, and directed them to retire and consider the case further. In the course of its remarks, the court made the following observations: "As I said to you in my instructions before you retired, you were to determine the facts in the case. I have a right, gentlemen, to express an opinion upon the facts in the case. You are not bound by the opinion that I express; but the State has presented this accused here on a charge of assault with intent to commit murder, and the State has produced for your consideration evidence of a very strong nature in support of such charge. I am expressing my opinion to you. You, however, are the ultimate determiners of the fact, and you are not bound by any opinion that I express. I have that right, however."

Error is assigned in the action of the court in returning the jury for further consideration; it being the claim of the accused that the jury had brought in a verdict of guilty of assault with intent to kill and

thereby a verdict of acquittal of the more serious charge of assault with intent to commit murder; and that the court was without power to return the jury for further consideration of the case. It is also claimed by the accused that the court erred in repeating to the jury, upon returning them for further consideration, a part of the court's charge, and further that it was in error in expressing its opinion to the jury upon the facts.

From the contradictory statements made by the foreman when interrogated by the clerk as to their verdict, as well as from the statements of members of the jury made at the time, it is quite evident that the jury, or some of them, were confused between the matters charged in the different counts of the information and the different verdicts they might render upon each count. The court evidently saw that its instructions had been misunderstood; and it was not at all clear what verdict the jury really desired to return.

When there is uncertainty as to the actual intent of the jury, the power of the court in a criminal case to return them to their room to render a clear and unambiguous verdict is, in this country, recognized as indispensable to an orderly and impartial administration of justice. The thing to be ascertained is the intention of the jury in their finding, in order that the proper sentence of law may follow; and it may be stated generally that when a jury returns an informal, insensible or repugnant verdict, or one that is not responsive to the issues, they may be directed by the court to reconsider it and bring in a proper verdict. *Owens* v. *State,* 82 Miss. 18, 33 So. 718, 720, 21 L. R. A. (N. S.) 782, 783; *Grant* v. *State,* 33 Fla. 291, 17 So. 757, 23 L. R. A. 723, 735. In England, in a criminal case, the court may send the jury back to reconsider

their verdict any number of times. *Regina* v. *Meany*, 9 Cox's C. C. 231, 233. In Connecticut, until a verdict is accepted by the court, it is no verdict at all. *Shulman* v. *Stock*, 89 Conn. 237, 241, 93 Atl. 531. Our statute (General Statutes, § 5657) authorizes the court, "if it judges the jury has mistaken the evidence in the cause and have brought in a verdict contrary to it, or have brought in a verdict contrary to the direction of the court in a matter of law, to return them to a second consideration, and for like reason, may return them to a third consideration, and no more." The origin of this statute was an Act passed in 1644, empowering the courts, if they thought a verdict not according to the evidence, to cause the jury to return to a second consideration of the case. If the jury still adhered to their verdict, it was to be discharged and another impanelled. In May, 1694, this Act was repealed in so far as it required the impanelling of another jury. In the Revision of 1702, and subsequent revisions, the statute appears in various forms substantially as at present. Public Statutes of Connecticut, Compilation of 1808, p. 37, note. That this statute applies to criminal as well as civil cases was recognized by CHIEF JUSTICE PRENTICE in *State* v. *Candido*, 93 Conn. 242, 244, 105 Atl. 442; and in *State* v. *Cianflone*, 98 Conn. 454, 462, 120 Atl. 347, CHIEF JUSTICE WHEELER stated: "General Statutes, § 5788 [being § 5657 of the Revision of 1930] gives the trial court discretionary power to return a jury for reconsideration twice." In *Black* v. *Griggs*, 74 Conn. 582, 584, 51 Atl. 523, we said: "The power thus granted is not in effect to set aside the verdict, as it must be exercised before the verdict is accepted, nor to refuse to accept the verdict as first rendered, since the court must receive it, at least after the third consideration, if in proper form. Inasmuch as the court may return the jury either because it

judges they have mistaken the evidence, or have misunderstood the directions of the court, it is proper for the court to inform the jury why they are so returned. While the remarks of the court to the jury in returning them, either regarding the evidence or regarding matters of law, are subject to review on appeal as a part of the charge (*West* v. *Anderson,* 9 Conn. 107, 111; *Scholfield G. & P. Co.* v. *Scholfield,* 71 Conn. 1, 23, 40 Atl. 1046), the power given by the statute to the court to so return the jury is largely a discretionary one, the reasonable exercise of which, in the absence of erroneous instructions to the jury in returning them, will not be reviewed by this court, especially when it appears that the verdict finally accepted is not, by reason of the charge made, contrary to the law or the evidence." In view of the uncertainty as to what verdict the jury really intended when first reporting, the trial court exercised its discretion wisely in returning them for further consideration. The repetition of part of the previous charge as to the meaning of malice aforethought and its bearing upon the distinction between the several degrees of crime charged in the information, and the different verdicts which the jury might return on each count, was appropriate to the situation, and conformed to our practice. *State* v. *Candido,* 93 Conn. 242, 244, 105 Atl. 442; *Shulman* v. *Stock,* 89 Conn. 237, 241, 93 Atl. 531.

The court, after clearly and unequivocally stating to the jury that they were the judges of the facts and were not bound by the opinion of the court, did not exceed its discretion in expressing the opinion that the State had produced evidence of a very strong nature in support of the charge, especially in view of the fact that the accused, in his own testimony, admitted the shooting in each case and differed from the State only in unimportant details, his principal claim being that

although he did the shooting, he did not intend to seriously injure the officers and did not, in fact, do so, and therefore was not guilty of assault with intent to commit murder. It is without question the law of this State that the court may, in its discretion, "comment on the evidence or upon the weight of evidence, so long as it does not direct or advise the jury how to decide the matter." *State* v. *Cabaudo*, 83 Conn. 160, 163, 76 Atl. 42; *State* v. *Rome*, 64 Conn. 329, 338, 30 Atl. 57; *State* v. *Cianflone*, 98 Conn. 454, 467, 120 Atl. 347; *State* v. *Chapman*, 103 Conn. 453, 485, 486, 130 Atl. 899. There is nothing in the record indicating that the discretion of the trial court was abused in expressing its opinion upon the evidence under the circumstances of this case.

There is no error.

In this opinion the other judges concurred.