ELIZABETH BRUNEAU v. RICHARD F. QUICK ET AL.

SPEZIALE, C. J., PETERS, HEALEY, ARMENTANO and SHEA, Js.

618

Argued May 11—decision released July 20, 1982

*Dion W. Moore,* for the appellant (defendant Alan J. Quick).

*Richard A. Bieder,* for the appellee (plaintiff).

ARTHUR H. HEALEY, J. This is an action for claimed podiatric malpractice arising out of certain operative procedures performed by the defendant, Dr. Alan J. Quick, on the feet of the plaintiff in

1975.[1] After a trial to the jury, a verdict was returned in favor of the plaintiff. This appeal followed the trial court's denial of the defendant's motion to set aside the verdict.[2]

On appeal, the defendant claims that (1) certain medical and hospital bills were erroneously admitted into evidence; (2) the trial court erroneously admitted and submitted to the jury certain claims of malpractice not disclosed prior to trial; (3) the trial court's comments on the evidence in its instructions to the jury exceeded the bounds of fairness and propriety; (4) the trial court erred in its jury instructions in its reference to an admission by the defendant's counsel, during his final argument, and in its instructions concerning a presumption of liability and the preexisting condition of the plaintiff; and (5) the verdict was excessive.

There was evidence before the jury from which they could have found the following facts: The plaintiff, who was born in 1915, had a pes cavus condition in her feet from childhood.[3] While growing up, she had participated in sports. In the mid-1950s she became interested in ice skating and eventually became "hooked" on skating concentrating on ice dancing and figure skating. About a year after she began skating, she and her husband, who is now eighty-two years old, became amateur ice dancing

---

[1] This action was originally instituted against Richard F. Quick and Alan J. Quick. At the conclusion of the case and prior to its submission to the jury, the case was withdrawn as to Richard F. Quick and submitted to the jury as to Alan J. Quick only.

[2] The defendant had moved to set aside the verdict on the grounds that it was (1) contrary to law; (2) against the evidence; and (3) excessive.

[3] The defendant's brief points out that the pes cavus condition is a bony deformity characterized by a high arch, claw feet and hammertoes.

partners. She became a very proficient skater, appearing in exhibitions as well as achieving the higher levels in amateur skating. After she began skating and before August 1975, at the peak of her interest in skating, the plaintiff skated for about three hours a day, six days a week.

Because skate boots were never made with a high enough arch for her, she always had her new skates built up somewhat. As she was skating a great deal, she would get new boots about once a year. She used to take the new boots to a Dr. Graff in Long Island and he would put pads on the inside and build up the arch so that it would take the weight off what she knew was the "sesamoid area" of the feet.[4] She had a painful corn on the bottom of each foot within an inch of her great toe under the tibial sesamoid bone which combined with her pes cavus condition to cause her some discomfort while skating. The padding she had had inserted into her skating boots, together with palliative treatment to the corns, enabled her to skate in the manner and as frequently as she wished prior to August, 1975. This included her ability to flex her great toes which is important in her ice skating. She had no surgery on her feet prior to August, 1975 to alleviate this condition although she had the corns treated palliatively.

In August, 1975, she bought new skates and, not wanting to go all the way to Long Island, went to see the defendants, upon the recommendation of a friend, to have the skates padded and made comfortable for her. After examining her feet, the

[4] "Sesamoid" is defined as "relating to or being a nodular mass of bone or cartilage in a tendon esp. where the tendon passes over a joint or some bony prominence." Webster, Third New International Dictionary.

defendants recommended that she undergo a surgical procedure known as a partial sesamoidectomy[5] to reshape the bottom portion of the sesamoid bone. The defendant, Alan J. Quick, told her she would no longer have to have her skate boots built up if she had the operation. After the plaintiff talked to her husband and executed a consent form, the defendant performed this operative procedure on her right foot late in August, 1975 and on her left foot on September 4, 1975. These operative procedures were substantially the same on both feet.[6]

The defendant made the incision for the approach[7] to the operative site, i.e., the sesamoid bone, from a point on the plaintiff's feet that violated the existing standard of care for a podiatrist for this operative procedure.[8] The defendant admitted that if he were doing this procedure at the time of trial, "I would probably change the incision site" and move it to the "medial" side. The causal relationship between this violation of the standard of care and the injuries suffered by the plaintiff, including

[5] This technique is a reshaping of the sesamoid bone which is instrumental in relieving pressure and results in the elimination of the corn.

[6] On cross-examination the defendant said that this was the first time he had done this surgical procedure. He also said that whatever he did to the right foot, he did with regard to the left foot.

[7] There was evidence that the defendant made the approach on the sole of the foot on the lateral side rather than on the medial side. In the defendant's approach there was, inter alia, a tendon "that is right in the way of your incision." There was evidence from which the jury could have found that a severing of the tendon, which is involved in the biomechanics of the foot, at the very least, contributed to the plaintiff's inability to flex her great toes.

[8] This procedure involves inserting a rotary burr through the incision and loosening tissue over the sesamoid bone. The burr, when activated, rotates under the operator's control and is used in "planing the bone (sesamoid)." Several Polaroid X-rays that develop in about ten seconds were taken during this procedure.

the loss of flexion of her great toes, could reasonably be found on the evidence before the jury.[9] The ability to flex the great toe is vital in the biomechanics of the plaintiff's feet and in her ice skating by enabling her to "push off." There was also evidence before the jury of a proper causal relationship between the defendant's surgical procedures and the effects upon the other activities and lifestyle of the plaintiff and her complaints of pain. The plaintiff also adduced evidence of the permanency of her condition.

The defendant first claims that the court erred in admitting certain bills into evidence because there was no competent medical testimony that they were proximately related to any negligence of the defendant. This claim concerns the bill for the services of Beckett Howorth, an orthopedic surgeon, for $300 and the bill for the Greenwich Hospital for $669. We have upheld the admission of doctors' bills, even though the doctor has not appeared and testified, where the plaintiffs testify that the bills have been incurred as the result of injuries received. See *Bonczkiewicz* v. *Merberg Wrecking Corporation*, 148 Conn. 573, 583–84, 172 A.2d 917 (1961). As was the case here, corroboration as to the attendance of the doctor upon the plaintiff is also furnished by hospital records admitted into evidence. See *Bonczkiewicz* v. *Merberg Wrecking Corporation*, supra, 584. Where unreasonableness does not appear on the face of the bills, they may, in the discretion of the court, be admitted under the rule of such cases as *Flynn* v.

---

[9] There was evidence that "part of what she is suffering now is as a result of the pes cavus foot and part is as a result of the flexor longus (tendons) being unable to flex." There was evidence that the flexor tendon was injured by the approach taken by the defendant in his surgical procedures.

*First National Bank & Trust Co.,* 131 Conn. 430, 436, 40 A.2d 770 (1944), and *Carangelo* v. *Nutmeg Farm, Inc.,* 115 Conn. 457, 462, 162 A. 4 (1932). See *Storm Associates, Inc.* v. *Baumgold,* 186 Conn. 237, 246, 440 A.2d 306 (1982); *Nash* v. *Hunt,* 166 Conn. 418, 430–31, 352 A.2d 773 (1974). There is no claim that the two bills involved here are unreasonable.

After the defendant's operations on the plaintiff's feet, her great toes were not flexing and she had pain. The plaintiff went to Howorth knowing that some other skaters had gone to him and that he did a great deal of work with feet. Howorth recommended and later performed a plantar fascia operation[10] on her feet at the Greenwich Hospital. The clinical resume in the hospital record indicates that the plaintiff, who was admitted on September 30, 1975, following the operation by the defendant, had lost the power of flexion and complained of pain in the balls of her feet particularly with weight bearing. Howorth told her that the reason for the plantar fascia operation would be to drop her high arch condition and that, with her feet immobile in casts applied at that operation, he hoped that if the tendon(s) were "going to have any chance of growing back, [or] rehealing . . . that they would have a chance with the cast on, where [her] toes weren't— flexing." Testimony given by Mark Shangold, one of the plaintiff's experts, could reasonably be interpreted to indicate the existence of tendon damage related to the plaintiff's inability to flex resulting from the defendant's procedure. Thus, a causal relationship between these medical bills and the defendant's negligence was established and there

---

[10] Beckett Howorth's preoperative diagnosis was claw feet with hammertoes, metatarsal calluses and defective flexor hallicus tendons. The hallux is the great toe.

was no error in admitting the bills of Howorth and the Greenwich Hospital. Cf. *Budney* v. *Zalot,* 168 Conn. 388, 362 A.2d 861 (1975).

The defendant next claims that the trial court erred in the admission of certain claims of malpractice not disclosed prior to trial. We do not agree. The defendant argues that on the second day that Shangold testified, the trial court permitted the plaintiff's counsel to ask questions of him "which opened up two entirely new areas of inquiry" which related to the issues of "informed consent" and the manner in which the sesamoid bone was shaped during the operation itself. Shangold and Martin M. Pressman were the two expert podiatric witnesses who testified for the plaintiff; the defendant had deposed both of them before trial. The defendant points out that earlier, at his deposition, Shangold was asked the following question and gave the following answer: "Q. What was the malpractice that you concluded existed in connection with the treatment of Elizabeth Bruneau by Dr. Alan Quick? A. The *primary* fact that I based my decision on was the position of his approach, the direction of his approach and the placement of his incision." (Emphasis added.) Thereafter, when asked if there was any other complaint he had concerning the defendant's handling of the plaintiff's case, he answered: "There are certain things that I really don't know, to make it specific that there was absolutely anything else. I don't know if he gave her completely other methods of treatment, which other ways that this could be treated, other surgical techniques that could have been formed, the variation of whether total sesamoidectomy or the sesamoid reduction that he chose to do. That's about all."

The defendant's claims are without merit. First, among the allegations of negligence in the complaint were those contained in paragraphs 4 (f) and 4 (g). The former alleged that the plaintiff's injuries were caused by the defendant's negligence in that he "improperly injured the tendons in the plaintiff's feet during the performance of the operative procedures as hereinbefore stated" and the latter that he "failed to inform the plaintiff of the risks, hazards and complications inherent in the procedure they were to perform." Thus, the defendant had been on notice of these (and other) allegations of negligence long prior to the depositions of the plaintiff's experts. Paragraph 4 (f) permitted the introduction of evidence relating to the shaping of the sesamoid bone during the surgery and paragraph 4 (g) is framed to permit evidence on the issue of informed consent. This does not present a situation where the complaint contained no allegations affording a basis for the introduction of such evidence. Cf. *Brangi* v. *Marshall*, 117 Conn. 675, 677, 168 A. 21 (1933).

We cannot accept the defendant's claim that because Shangold testified as he did at his deposition that his counsel "had been led to believe by both the plaintiff's experts that they [the two claimed new issues] were not matters to which they ascribed any malpractice."[11] "Technically, a deposition is the written testimony of a witness given in the course of a judicial proceeding. A deposition may be taken in advance of the trial or hearing, or during the course of the proceeding, on oral examination or in response to written interrogatories

---

[11] The defendant, in claiming the injection of these new issues at trial, also points to the testimony of Martin Pressman *at the trial* that he found the remodeling of the sesamoid bone was "adequate."

with an opportunity for cross-examination. . . ."
(Citation omitted.) *Gordon* v. *Indusco Management Corporation,* 164 Conn. 262, 270, 320 A.2d 811
(1973). It may be used at trial to test the credibility of the deponent as he testifies. We do not
agree that in this case the answers of Shangold
referred to by the defendant served to "lock in"
the plaintiff, as apparently claimed, or that the
defendant's counsel was led to believe as he claims.
Shangold did say that the "primary" fact on which
he based his decision was the position of the defendant's approach. That statement suggested that
there were more facts upon which he also relied.
His other answer referred to by the defendant does
not close the door to other considerations. No claim
is made by the defendant that he questioned Shangold about each allegation of the complaint as he
might have. We find no error in the trial court's
action here.

The defendant's next attacks are directed at the
court's charge to the jury. He claims (1) that the
trial court's comments on the evidence exceeded the
bounds of fairness and propriety and (2) that the
court erred in its instructions concerning (a) a
reference to an admission by the defendant's counsel to the jury during final argument, (b) a presumption of the defendant's liability, and (c) the
preexisting condition of the plaintiff.

In attacking the court's comments on the evidence, the defendant argues that the "court made
extensive references to the evidence adopting, for
the most part, the plaintiff's Request to Charge"[12]

---

[12] The defendant maintains that this request of the plaintiff was
improper as it failed to state a single proposition of law with citation of authority and was, in substance, merely a restatement of the
plaintiff's factual argument.

resulting, it is claimed, in "extensive inequities in the charge as it related to the evidence." This encompasses assertions of error (1) that certain testimony of Shangold and Pressman, and certain evidence on the issue of "informed consent" were not fairly presented in the charge, (2) that certain statements of these two podiatrists on the issue of proximate causation of the plaintiff's current inability to flex and her pain were incorrectly stated, and (3) that this surgery was the first of this kind that the defendant had performed on the third sesamoid bone.[13]

We do not agree that the court's comments on the evidence exceeded the bounds of fairness and propriety. "It is within the discretion of the court to make reasonable comments on or reference to the evidence; *Tezack* v. *Fishman & Sons, Inc.,* 173 Conn. 183, 186, 377 A.2d 272 [1977]; *State* v. *Schoenbneelt,* 171 Conn. 119, 124, 368 A.2d 117 [1976]; *Anderson & McPadden, Inc.* v. *Tunucci,* 167 Conn. 584, 590, 356 A.2d 873 [1975]; but in so doing, it should be careful to avoid any misstatement of the facts or evidence. *Ladd* v. *Burdge,* 132 Conn. 296, 298, 43 A.2d 752 [1945]; 88 C.J.S., *Trial,* § 272." *Filakosky* v. *Valente,* 175 Conn. 192, 194–95, 397 A.2d 95 (1978); see *Gosselin* v. *Perry,* 166 Conn. 152, 164–65, 348 A.2d 623 (1974); *Gorham* v. *Farmington Motor Inn, Inc.,* 159 Conn. 576, 583, 271 A.2d 94 (1970).

In assessing a claim such as that made in this case by the defendant, we reiterate the rule that

---

[13] The defendant's brief also indicates that the comments by the court that the plaintiff had flexion before the operation but not afterwards were "in effect an invitation to the jury to apply the theory of *res ipsa loquitur.*" This claim merits no further discussion except to point out that the charge read as a whole clearly disproves this claim.

the "court's review of the evidence in its charge to the jury is subject to the overriding consideration that its comments be fair and that they not mislead the jury, so that injustice is not done to either party. *Enlund* v. *Buske,* 160 Conn. 327, 331, 278 A.2d 815 [1971]; *Szlinsky* v. *Denhup,* 156 Conn. 159, 163, 239 A.2d 505 [1968]; *Ladd* v. *Burdge,* [supra, 298]." *Anderson & McPadden, Inc.* v. *Tunucci,* supra, 589. Within constitutional limitations concerning trial by jury, the nature and extent of the trial court's comments on the evidence must largely depend on the facts involved in a particular case and the manner in which it has been tried. *Anderson & McPadden, Inc.* v. *Tunucci,* supra, 590; *Quednau* v. *Langrish,* 144 Conn. 706, 710, 137 A.2d 544 (1957). While a trial court has not only the right but often the duty to comment upon the evidence; *Quednau* v. *Langrish,* supra; *Laffin* v. *Apalucci,* 128 Conn. 654, 657, 25 A.2d 60 (1942); *Bundy* v. *Capital National Bank & Trust Co.,* 124 Conn. 309, 314, 199 A. 561 (1938); it is not licensed to "indulge in an argumentative presentation of the claims of one side." *Bundy* v. *Capital National Bank & Trust Co.,* supra; *Anderson & McPadden, Inc.* v. *Tunucci,* supra, 591; *Tuckel* v. *Hartford,* 118 Conn. 334, 337, 172 A. 222 (1934). In a word, " '[i]nstructions should not be so drawn as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over portions of the testimony on the other side which deserve equal attention.' " *State* v. *Rome,* 64 Conn. 329, 339, 30 A. 57 (1894); see *Anderson & McPadden, Inc.* v. *Tunucci,* supra; *State* v. *Searles,* 113 Conn. 247, 258, 155 A. 213 (1931); Maltbie, Conn. App. Proc. § 89. The wide discretion a trial court has in its comments on the evidence may not require it to

discuss particular items of testimony, particularly where issues were clearly delineated during the trial, where the arguments of counsel fairly presented the case[14] and where there was no request to charge.[15] *Gosselin* v. *Perry,* supra, 165; *Quednau* v. *Langrish,* supra, 710. In examining the court's charge, the basic charge and the supplemental instructions are to be read and considered as a whole.[16] *DePaola* v. *Seamour,* 163 Conn. 246, 253, 303 A.2d 737 (1972); *Hanken* v. *Buckley Bros., Inc.,* 159 Conn. 438, 442, 270 A.2d 556 (1970).

Initially, we note that at the beginning of its basic charge the court indicated its right to make comments to the jury about the evidence but stated that it did so only "for the purpose of aiding you in applying the law to the facts" and that to do so "will be merely to help you understand the law . . . ." Stating that it would "probably stress this as much as anything in the case," it went on to acknowledge that "there's a danger that in my mentioning certain facts, you'll think that I'm stressing these over others, or that I believe thus and so to be the facts, and I don't. The facts are up to you." At that time, it told the jury that their recollection of the evidence prevailed over that of the court and counsel

---

[14] During its instructions, just before it took up the allegations of negligence in the complaint, the court said: "Now, I'm not going to repeat the arguments of Counsel, which were well made and candid and fair, I thought, both in opening and in closing. They stated their view of the situation in an excellent manner, which is, I'm sure, very fresh in your minds."

[15] The plaintiff filed a rather long request to charge with her claims on certain portions of the evidence; the defendant did not. This became the subject of some discussion at the end of the court's original charge to the jury when the defendant excepted to the court's comments on the evidence.

[16] No further exceptions were taken to any of the court's supplemental instructions in this case.

and that, "[i]f I should refer to certain facts or evidence and not to others, you are not to think that I mean thereby to emphasize those facts or limit your consideration of them or that I have any less regard for those factual claims to which I do not refer." Immediately thereafter it told the jury that although the major part of the factual evidence it was going to use would relate to the plaintiff's arguments that, nevertheless, that "does not mean for a moment you are not to give equal consideration to questions raised by Defense Counsel in their questions . . . or argument, in the testimony of their experts. . . . Even if I make an error in the evidence, it's your memory and decision on the facts that counts."[17] Just before it discussed the allegations of negligence, the court said it was about "to try to relate the evidence to the pleadings."[18] In the process of charging on damages, the court said: "Now, here I may get, I hope not, slightly repetitive, because I want to make certain that I,

_____

[17] The specific instructions of the court here were: "If your recollection of the evidence differs from mine or from Counsel in their argument, it's your memory that must prevail and not the Court's or not Counsel's. If I should refer to certain facts or evidence and not to others, you are not to think that I mean thereby to emphasize those facts or limit your consideration to them or that I have any less regard for those factual claims to which I do not refer. A good example of this is the, probably the major part of the factual evidence that I'm going to use will relate to the arguments of the Plaintiff because the Plaintiff has the burden of proof, and the Plaintiff has tried to establish a deviation from the standard of medical care applicable in the case. That does not mean for a moment that you are not to give equal consideration to questions raised by Defense Counsel in their questions, direct or cross-examination or argument, in the testimony of their experts, which, of course, in many ways is contrary of what the Plaintiff's witnesses and evidence may claim to show. Even if I make an error in the evidence, it is your memory and decision on the facts that counts."

[18] During the instructions it removed several allegations of negligence from the jury's consideration.

in describing the facts, describe them as fairly as humanly possible, both from the Plaintiff's and the Defendant's standpoint."

Our examination of the instructions to the jury discloses that the trial court did comment on the plaintiff's evidence and her claims with reference to it as it said it would.[19] It did not do so, however, in a manner that we can find to be clearly erroneous under the circumstances. See Practice Book § 3060D. In its charge, the trial court characterized the defendant's position on the evidence, although

---

[19] The defendant excepted to the court's charging from a plaintiff's request that "[y]ou may also consider Doctor Quick's testimony that this was his first surgery." This language appeared in the charge in the body of an instruction of an allegation of negligence that the defendant "failed to seek, recognize and identify the anatomical structures in the operative field or area." In instructing on this the court stated in part: "You may also consider Doctor Quick's testimony, this was his first surgery of this kind on the tibial sesamoid and Doctor Shangold's testimony that it would violate the standard of care to cross tendons not necessary to be crossed in this surgery." The exception, fairly read, is that there is a "suggestion or presumption . . . that because this may have been somebody's first surgery, it was then and therefore done in a negligent manner." The court, despite its statement of "No change" upon hearing the exception did charge the jury as part of the supplemental charge: "Please listen with care. I'm going to do my best not to try to emphasize anything particularly because I'm going to make some changes. I think that the charge needs some tidying up with the help of both these lawyers, but you've got to integrate it altogether in your thinking so it will make one complete whole.

"First, concerning the standard of care, negligence, I stated to you that in the absence of evidence to the contrary, the law will presume from the physician's right to exercise his profession that he is not violating his duty to exercise it with the requisite care and skill. The law will presume from the physician's right to exercise his profession that he has not violated his duty to exercise it with the requisite care and skill. That is not the law. Ignore it. There is no presumption that he has not violated his duty." In the context of the charge as a whole, including the fact that the defendant made this statement at least twice where it was not in response to a direct question eliciting this observation, we decline to predicate clearly erroneous error on this claim.

not in as great length as that of the plaintiff. We cannot say, however, that this was done so that "undue prominence" was given to any particular feature of the plaintiff's case so that we would be required to find the ultimate test of fairness must be resolved against the plaintiff. *Anderson & McPadden, Inc.* v. *Tunucci, supra,* 591. In response to the defendant's exception here, the court asked the defendant's counsel, "[w]hat do you wish me to comment on?" listened to his comments, admitted it had been incorrect in certain aspects, and indicated what it would do and not do in that regard. It recalled the jury and gave supplemental instructions to which no exceptions were taken. Applying the principles of law set out above to this claim, we cannot accept the defendant's claim that the court's comments were a "judicial imprimatur" on the plaintiff's theory of the case.

Three other claimed errors in the court's instructions not specifically related to its comments on the evidence require some discussion. The first is that the court erred by charging that "defense counsel admitted a violation of the standard of care in his closing argument" to the jury. This claim is without merit. The court admitted and corrected whatever error it had made. It had the reporter read back the pertinent portion of the argument in the absence of the jury and adequately addressed the exception in its supplemental instructions[20] to the jury.

---

[20] In its supplemental instructions the court charged as follows: "Finally, to the extent that I said during the charge that as final argument, Defense Counsel said he presumed there might have been some interference with the standard of care by damaging the flexor longus tendon, the Court was in error, and so that we can be exact on this, I'm going to have the Reporter read a section of his argument, not to over-emphasize it, because it's clear that in my description of what he said I was listening accurately."

Second, the defendant suggests that the court's charge, in its adaptation of a plaintiff's request to charge, "also created conflicts in its previously correct charge on the law" touching on the applicable standard of care. No exception was taken to the basic or the supplemental instructions specifically directed to this issue. See Practice Book § 3060F. Therefore, we find no error here. See *Thomas* v. *Katz,* 171 Conn. 412, 413–14, 370 A.2d 978 (1976).

The last error claimed in this trilogy is that the court charged "to the effect that the defendant could not excuse himself by saying that the plaintiff had a pre-existing condition." This, he maintains, was a "modified 'aggravation of a pre-existing condition' charge." The defendant correctly points out that the court charged that the defendant took the plaintiff as he found her and that she was entitled to recover damages for all her injuries and damages even though they were more serious or prolonged than otherwise because of her preexisting pes cavus foot condition. The gravamen of his attack is that there was "absolutely no testimony which suggested that this condition [the plaintiff's pes cavus foot condition] had been aggravated, and Dr. Quick should not be held responsible for a condition which had no bearing on the operation." This claim is wide of the mark.

There is no question that the defendant took the plaintiff as he found her; *Thompson* v. *Lupone,* 135 Conn. 236, 239, 62 A.2d 861 (1948); *Sapiente* v. *Waltuch,* 127 Conn. 224, 227, 15 A.2d 417 (1940); *Flood* v. *Smith,* 126 Conn. 644, 647, 13 A.2d 677 (1940); and that he would be liable to the plaintiff for the effect of the injuries caused by him "even though their effect might be more serious than in the case of a normal person." *Boland* v. *Vanderbilt,*

140 Conn. 520, 524, 102 A.2d 362 (1953); see *Thompson* v. *Lupone,* supra; *Mourison* v. *Hansen,* 128 Conn. 62, 65, 20 A.2d 84 (1941). The court made it clear that this was not an "aggravation of a pre-existing condition" stating that there was "no claim that a previous condition of pes cavus was aggravated." Immediately thereafter, the court said, "but I believe there is evidence from which you could find or infer that the effect on this particular Plaintiff of some of the claimed injuries may be different in degree because she had a pes cavus foot condition than if she didn't. That's entirely, of course, up to you." Not only was the charge correct, but there also was evidence upon which to base such a finding for the plaintiff.

Finally, the defendant claims that the verdict in the amount of $61,000 is excessive. We do not agree. The trial court refused to set the verdict aside as excessive. Its refusal to do so "is entitled to great weight and every reasonable presumption should be given in favor of its correctness." *Pisel* v. *Stamford Hospital,* 180 Conn. 314, 343, 430 A.2d 1 (1980); see *Ochs* v. *Borrelli,* 187 Conn. 253, 261, 445 A.2d 883 (1982); *Kiniry* v. *Danbury Hospital,* 183 Conn. 448, 462, 439 A.2d 408 (1981); *Katsetos* v. *Nolan,* 170 Conn. 637, 656, 368 A.2d 172 (1976). "[T]he amount of an award is a matter peculiarly within the province of the trier of facts. . . . 'The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption. . . .'" (Citations omitted.) *Pisel* v. *Stamford Hospital,*

supra, 342–43. "On appeal, the conclusion of the trial court from the vantage point of the trial bench cannot be disturbed unless the trial court abused its discretion." *Katsetos* v. *Nolan*, supra, 656; see *Kiniry* v. *Danbury Hospital*, supra; *Nichols* v. *Coppola Motors, Inc.*, 178 Conn. 335, 349, 422 A.2d 260 (1979).

The plaintiff's special damages, which were medical expenses, totaled $1694. There was no claim for loss of earnings or earning capacity. There was, however, a claim for permanency, physical and mental pain and suffering and an impairment in her ability to carry on and enjoy certain activities.[21] At the time of trial the plaintiff had a life expectancy of 18.1 years.

The evidence before the jury compared Mrs. Bruneau's activities and life-style for some years before August, 1975 and thereafter to the time of trial. While growing up she participated in many sports offered in school. She coached high school women's teams in field hockey, basketball and skating in the 1950s. She took up ice skating in the 1950s and, as she testified, became "hooked" on ice skating. Despite her pes cavus foot condition, she and her husband became partners in amateur ice dancing and she progressed through various levels of proficiency in that activity.[22] Skating was

---

[21] In his brief the defendant does concede some disability from his negligence saying, "[t]he only disability resulting from Dr. Quick's operation was some interference with the flexor longus tendon. All other muscles were found to be unaffected." In charging on permanency, the court said in part: "My memory is that there was expert testimony that the condition of the flexor longus tendons was a permanent condition." There was no exception by the defendant to the charge on permanency.

[22] There was evidence that the plaintiff and her husband had appeared in a number of milk fund shows at Madison Square Garden as part of a group put on by the Skating Club of New York, par-

their principal activity together. There was evidence that at the age of fifty-eight and before the surgery by the defendant she was the best ice skater at her age and level in New England. Prior to the surgery by the defendant, she was skating about three hours a day for six days a week. After her operations in 1975, she was unable to skate as she had before. She had enjoyed sailing with her husband in their sailboat over the years. After her surgery, they went sailing but she no longer was able to move about the boat to assist him actively as she had for years but remained seated at the tiller. She and her husband enjoyed ballroom and modern jazz dancing; she was no longer able to dance with her husband after surgery. She relished gardening and doing yard work around her home including pruning trees; she was no longer able to do so after her operations. After her foot surgery she would experience depression over her inability to use her feet as she had been accustomed. She has some difficulty tolerating walking. She has had and continues to experience pain in her feet.

The fact that the special damages are only $1694 is not critical in assessing the claim of excessiveness. The jury saw and heard the plaintiff and her husband. They saw and heard expert witnesses produced by both parties. They saw and heard the defendant. We have already set out the legal principles which we must properly consider. The trial court did not abuse its discretion in refusing to set aside the award as excessive.

There is no error.

In this opinion the other judges concurred.

---

ticipated in competitions of ice dancing and ice skating clubs from time to time, and the jury viewed movies of their skating in an ice show at Lake Placid put on in conjunction with a television program.