STATE OF CONNECTICUT *v.* DAVID M. POLLITT
(12431)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and GLASS, Js.

Argued June 10—decision released September 1, 1987

*William F. Dow III,* for the appellant (defendant).

*Guy W. Wolf III,* assistant state's attorney, with whom, on the brief, was *Arnold Markle,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant, David M. Pollitt, was found guilty after a jury trial of the crimes of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A),[1] and sexual assault in the first degree in violation of General Statutes § 53a-70 (a).[2] An appeal followed.

Upon hearing the appeal, in which the defendant raised several claims of error, we remanded the case to the trial court for the purpose of augmenting the record so that we could conduct a "meaningful appellate review" of the defendant's claim of error premised on *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). *State* v. *Pollitt,* 199 Conn. 399, 415, 508 A.2d 1 (1986).[3] In remanding for an evidentiary hearing, we indicated that the trial court must resolve "whether the state suppressed . . . *Brady* material that was favorable and material to the defendant." Id., 416. The alleged *Brady* material involved was the sworn statement of David Isola given to the Wallingford police on October 20, 1981, four days after the

---

[1] General Statutes § 53a-92 (a) (2) (A) provides: "A person is guilty of kidnapping in the first degree when he abducts another person and when . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually."

[2] General Statutes § 53a-70 (a) provides: "(a) A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

[3] In doing so, we did not address the defendant's other claims of error. *State* v. *Pollitt,* 199 Conn. 399, 401–402, 508 A.2d 1 (1986).

crimes with which the defendant was charged had been committed.[4]

On remand, we directed the trial court to "make in writing those findings of fact and conclusions of law

[4] The October 20, 1981 statement of David Isola to the Wallingford police was:

"WALLINGFORD POLICE DEPT.
VOLUNTARY STATEMENT

STATEMENT OF: David Isola DOB: 05-07-61
ADDRESS: 61 Jobs Rd., PHONE#: 29-4880
Wallingford, CT
STATEMENT TAKEN BY: Detective Thomas Hanley,
Wallingford, PD
AT: Wallingford PD October 20, 1981 10:20 p.m.

"I, David Isola, am giving this statement of my own free will. On Saturday, October 17, 1981, I was home alone on Jobs Road. I had the police scanner on and I was listening to it. Around 5:30 p.m. or so, I heard on the Wallingford channel cars being dispatched to Grieb Road on an '0200.' I wasn't sure what that was. I listened a little while more, and heard they found a bike, and that they were checking out a white car somewhere. I then went over to George Hodge's house on Durham Road, which is near Grieb Road. This was only a few minutes after the dispatch of police to Grieb Road. I was at George's house only a few minutes, and George and I decided to go out and look for the guy. I had found out what an '0200' was because I have a book that has the codes in it. I knew that what had happened on Grieb Road was a rape. I had my scanner with me and I heard the police broadcast a description of the guy. All I knew at the time was that it was a male about my height. George and I went out driving around in my car, which is a blue '75 Nova. This was around 6:00 p.m. We drove west on Durham to Old Durham Road. We went west on Old Durham to Mapleview Road. We drove down Mapleview Road a ways, then turned around and drove back to Old Durham Road. I saw my younger brother Randy, Greg Hodge, and Jimmy Briers. They were walking along Old Durham Road. I told Randy that we were looking for a guy that raped some chick, and Randy told me there was a car in [T]hree [F]ields with a guy in it. [T]hree [F]ields are three fields bordered by Durham, Old Durham and East Main Streets. We drove west on Old Durham Road to the old dirt driveway across from Pine Glen Terrace. I then drove into the field, following a dirt road in the field. We drove to the third field up, and I saw a car parked way up in the back of the third field near a dirt road which leads to the pond off of Durham Road. This car was a white-yellowish car with red primer paint on the rear driver's side quarter panel. I believe this car was a Toyota Celica, 4 door, it was a newer car, but it was all beat up. This was like a squarish type car. The tail lights looked OK. There was

upon which it bases [its] determination, whatever it may be." Id. We further stated that "[i]n the event that [the court] resolves [the *Brady*] issue against the defendant, this court will then, in its supervisory capacity, upon the filing of those findings and conclusions, proceed to dispose of this appeal." Id.

The trial court[5] conducted an evidentiary hearing on remand and has filed its memorandum which includes

a male sitting in the car. He was a white male, medium build, maybe 160–175, about 5'8" tall. He had brown hair which was parted in the middle and feathered back. It was like a disco haircut, brushed back away from his ears, so his ears were exposed. He had a mustache cut away from his nose. The mustache wasn't that thick. It was dark. The mustache was short, not going past the end of his lips. This guy looked like he never shaved his sideburns, they seemed long, not thick. He was also unshaven under his chin down to his neck. The facial hair was not thick. I think this guy had dark eyes. He seemed Italian or Hungarian in looks. He was about 21–22 years old. This guy was wearing a flannel plaid jacket, or thick shirt on, it was brown or maroon for the basic color. He was alone in the car. I approached this guy after exiting my car. George sat in my car. I told this guy I was Choate [School] security. This guy's car was running at the time. He appeared nervous and tense. He never said anything. As I walked up to the car and told him I was Choate security, he drove off. I was only a foot or two from this person at the time. I then ran back into my car and went after him. He drove through the fields to the middle dirt driveway exiting on Old Durham Road. This driveway was blocked off with a mound of dirt, however, the guy drove right over it. I tried to follow him, but my car got hung up on a stump or something, and I got stuck. The Toyota went east on Old Durham Road. I did notice that the Toyota had a New York license plate on it. There was a "Y" in the registration and I think a G or a J in front of it, and I believe there was a 3 in the registration somewhere. I never saw the car again. On the way out of the driveway the car hit a stump or something, as I believe the headlight on the passenger side got knocked out. It should still be there at the driveway.

This guy resembled someone I went to school with and who lived on the east side of Wallingford several years ago, but I don't remember who it is.

Signed: /s/David Isola

SWORN TO AND SUBSCRIBED BEFORE ME THIS 20th DAY OF OCTOBER, 1981.

NOTARY PUBLIC: THEODORE P. MILEWSKI"

[5] Because the trial judge, *Mulvey, J.,* had retired prior to our decision in *State* v. *Pollitt,* 199 Conn. 399, 508 A.2d 1 (1986), the remand hearing was assigned to and conducted by *Hadden, J.*

At the evidentiary hearing conducted by *Hadden, J.,* the parties agreed that the court should take judicial notice of the entire transcript of the trial,

its findings of fact and conclusions of law. The trial court decided the *Brady* claim against the defendant. Thereafter, a supplemental record was prepared and the parties filed supplemental briefs and this court held a full hearing, at which the parties argued their claims concerning the remand as well as the other claims of error raised by the defendant in the original appeal.

In addition to the *Brady* claim, the defendant also claims that the trial court erred in: (1) instructing the jury on sexual assault in the first degree; (2) failing to instruct the jury accurately on the dangers of eyewitness identification and in its manner of "marshaling" the evidence presented during its instructions to the jury; (3) its admission of the evidence of his blood type; and (4) denying his pretrial motions to suppress the victim's identification.

I

It will be helpful to turn first to the *Brady* claim. The principal issue at the trial was the identity of the perpetrator of the crimes charged.[6] In *State* v. *Pollitt,* supra, we chronicled at some length certain evidence that was before the jury, certain applicable legal principles and the arguments of the state and the defendant directed to the issues raised by the defendant's *Brady* claim. We will not repeat them fully here, except where necessary to our discussion of the defendant's claims. The defendant argues not only that the state suppressed *Brady* material that was favorable and material to him, but also that the trial court erred in denying his motions for a mistrial or a continuance when he discovered midtrial allegedly exculpatory

the exhibits, the defendant's briefs on the appeal and our opinion in *State* v. *Pollitt,* supra. In addition, the testimony of assistant state's attorney Guy Wolf III, who was the state's trial and appellate counsel, and Detective Patricia Miranda of the Wallingford police department was presented.

[6] At trial, the defendant not only argued misidentification by the victim, but also offered witnesses on the matter of alibi.

material showing that another person had committed the crimes charged and the exculpatory witness, David Isola, could not be located at that time on such short notice. Id., 400, 408–11.

At the hearing on remand, the state conceded that it had had the Isola statement in its possession on October 20, 1981, and that it had not disclosed that statement to the defendant until midtrial in October, 1983. During that hearing, the court rejected the state's claim that evidence should be heard that Isola's statement of October 20, 1981, was a "total fabrication" given to create the impression that Isola was helping the Wallingford police in order to obtain his own release on a promise to appear on a relatively minor charge for which he had just been arrested. The remand court's memorandum states: "The state also made an offer of proof that Randy Isola, George Hodge and Gregory Hodge were all available and prepared to testify that they were with David Isola at the time in question and that the incident involving a man in a car in Three Fields, ás described in the Isola statement, did not occur." The state also argued that the remand court should not make its findings of fact and conclusions of law based on the contents of the Isola statement but that it should permit further evidence which would show that, even if David Isola had been located, the alleged exculpatory evidence would either never have been testified to at trial, or if Isola had so testified, he would not have been believed because of the contrary testimony of Randy Isola, George Hodge and Gregory Hodge. The defendant, on the other hand, objected to going beyond the contents of the statement itself.

The remand court agreed with the defendant and ruled that because the issue before it "was whether the state had suppressed *Brady* material that was favorable and material to the defendant, that the court was required to accept the alleged *Brady* material in the

form in which it existed and was not delivered to the defendant, and to proceed on the assumption that the precise contents of the Isola statement would have been testified to before the trial jury if the defendant had been aware of the statement." The court made its findings of fact and conclusions of law "[based] on that assumption."[7]

[7] The findings of fact and conclusions of law of the trial court, *Hadden, J.,* on remand are the following:

"1. The victim was kidnapped and sexually assaulted.

"2. The victim had ample opportunity to observe the assailant.

"3. The victim positively identified the defendant on a videotaped lineup as her assailant.

"4. The victim identified a photograph of the defendant as resembling her assailant.

"5. The victim's description of her assailant generally matched the defendant.

"6. The victim made a firm in-court identification of the defendant as her assailant.

"7. The defendant's car was seen parked in the immediate area of the assault at about the time of the assault.

"8. The defendant resided in Clinton, Connecticut.

"9. The defendant's fingerprints were found on the bicycle in the place where the assailant grabbed the bicycle.

"10. The seminal stains on the victim's clothes contained a substance that was consistent with the defendant's blood type and the fact that he was a secretor.

"11. The evidence contained in the Isola statement was that a man, not the defendant, whose description was similar to that of the assailant in some respects and dissimilar in others, was seen seated in a car which was not similar to the defendant's, in a field approximately one hour after the assault, and that the man appeared nervous and upset and drove off hurriedly when confronted.

"12. The field mentioned in the Isola statement where the car was seen is located approximately one mile from the scene of the assault.

"13. Had the evidence as set forth in the Isola statement been presented to the trial jury it would not have created a reasonable doubt in the minds of the jury as to the guilt of the defendant.

"Conclusions of Law

"1. The failure of the state to turn over the Isola statement to the defense was not of sufficient significance to result in the denial of the defendant's right to a fair trial.

"2. Had the Isola statement been disclosed to the defense there is not

On remand, the court determined that the victim had had "ample opportunity" to observe her assailant, that the victim had "positively identified" the defendant as her assailant on a videotaped lineup, that she had identified a photograph of the defendant "as resembling her assailant," that her description of her assailant "generally matched the defendant" and that she had made a "firm in-court identification" of the defendant as her assailant. The court also determined that although the defendant resided in Clinton, his car had been seen parked "in the immediate area of the assault at about the time of the assault," that "[t]he defendant's fingerprints were found on the [victim's] bicycle in the place where the assailant grabbed the bicycle" and that "seminal stains on the victim's clothes contained a substance that was consistent with the defendant's blood type and the fact that he was a secretor." It further found that "[t]he evidence contained in the Isola statement was that a man, not the defendant, whose description was similar to that of the assailant in some respects and dissimilar in others, was seen seated in a car which was not similar to the defendant's, in a field approximately one hour after the assault, and that the man appeared nervous and upset and drove off hurriedly when confronted." In that regard, it found also that the field mentioned in the Isola statement, where the car referred to in that statement was "seen," was approximately one mile from the scene of the assault. It then found that if the evidence set forth in the Isola statement had been pre-

---

a reasonable probability that the result of the trial would have been different.

"3. The Isola statement would not have tended to lead the jury to entertain a reasonable doubt as to the defendant's guilt.

"4. The Isola statement was not favorable and material to the defendant.

"5. The state did not suppress *Brady* material that was favorable and material to the defendant.

"This court, having resolved the first issue set forth in the remand order against the defendant, herewith files its findings and conclusions in accordance with the remand order."

sented to the jury, it would not have created a reasonable doubt in the minds of the jury as to the guilt of the defendant.

The court's conclusions of law were: that the failure of the state to turn over the Isola statement to the defendant was not of "sufficient significance" so as to result in a denial of his right to a fair trial; that, had it been disclosed, there was not a reasonable probability that the result of the trial would have been different; and that the statement would not have tended to lead the jury to entertain a reasonable doubt about the defendant's guilt. Moreover, the court also concluded that the Isola statement was not favorable and material to the defendant and that, therefore, the state had not suppressed *Brady* material that was favorable and material to the defendant. We agree with the factual and legal determinations of the court on remand and conclude, therefore, that the trial court, *Mulvey, J.*, did not err on this issue as claimed.

In *Brady* v. *Maryland,* supra, 87, the United States Supreme Court stated that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Later, in *Moore* v. *Illinois,* 408 U.S. 786, 794–95, 92 S. Ct. 2562, 33 L. Ed. 2d 706, reh. denied, 409 U.S. 897, 93 S. Ct. 87, 34 L. Ed. 2d 155 (1972), the court stated: "[t]he heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence." See *State* v. *Green,* 194 Conn. 258, 263, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S.

Ct. 964, 83 L. Ed. 2d 969 (1985). Impeachment evidence as well as exculpatory evidence falls within *Brady's* definition of evidence favorable to an accused. *United States* v. *Bagley,* 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *Giglio* v. *United States,* 405 U.S. 150, 154–55, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Brady* v. *Maryland,* supra, 87; *United States* v. *Polizzi,* 801 F.2d 1543, 1553 (9th Cir. 1986).

In illuminating the standard of materiality that must be met, the United States Supreme Court said in *United States* v. *Agurs,* 427 U.S. 97, 108, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), that "the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." See also *State* v. *Pollitt,* supra, 412. Thereafter, in *United States* v. *Agurs,* supra, the court fashioned a two-tiered framework for determining materiality. With reference to evidence that the defense specifically requested, the standard was whether the evidence "might have affected the outcome of the trial." Id., 104. With reference to evidence requested generally or evidence not requested at all, the standard was that evidence was material if it "creates a reasonable doubt that did not otherwise exist." Id., 112. In *United States* v. *Bagley,* a divided United States Supreme Court, drawing on *Strickland* v. *Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), reformulated the materiality standard. Justice Blackmun, writing for a plurality, opined that the *Strickland* formulation of the *Agurs* standard was "sufficiently flexible" to encompass all three circumstances of prosecutorial failure to disclose evidence favorable to the defendant, i.e., the "no request," the "general request" and the "specific request" situations. *United States* v. *Bagley,* supra, 682. The *Bagley* standard of materiality is as follows: "The evidence is material only if there is a reasonable prob-

ability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. *Bagley* thus adopted *Strickland's* "reasonable probability" standard to assess materiality for use in prosecutorial nondisclosure situations. Therefore, there is no need to determine whether the defendant's request was specific because the standard for materiality would remain the same. Fairness, however, dictates that we recognize it as a specific request. See *State* v. *Pollitt,* supra, 408 n.8.

Applying the relevant principles of law to this case, we find no error on this issue, either by the court at the time of trial, *Mulvey, J.,* or by the court on remand, *Hadden, J.* This conclusion is reached after an evaluation of the claimed suppression "in the context of the entire record"; *United States* v. *Agurs,* supra, 112; including the record as "augmented" by the court on remand. See *State* v. *Pollitt,* supra, 415. " '[T]he materiality determination is not to be made in a vacuum; rather it must be made in the context of all the evidence introduced at trial.' " *United States* v. *Jackson,* 780 F.2d 1305, 1311 (7th Cir. 1986), quoting *United States* v. *Esposito,* 523 F.2d 242, 248 (7th Cir. 1975), cert. denied, 425 U.S. 916, 96 S. Ct. 1517, 47 L. Ed. 2d 768 (1976).

The defendant argues that the remand court erred in concluding that the state had not suppressed *Brady* material that was favorable and material to the defendant. Specifically, the defendant disputes certain factual findings made by the court and argues that the court failed to recognize the "significance" of the Isola statement. We disagree. The remand court acknowledged not only that "the principal issue at trial was the identity of the perpetrator" but also that the defendant claimed that the Isola statement was favorable and

material on that issue. Its findings of fact are adequately supported by the record and its conclusions of law legally follow from those findings.

A helpful starting point is the identification itself.[8] In *State* v. *Pollitt,* supra, we indicated the sequence and circumstances that led to the victim's pretrial identification of the defendant as her assailant. Id., 401–404. This evidence includes not only the victim's dissatisfaction with a proposed composite drawing of her assailant, but also her examination of "at least two hundred [mug shots] perhaps more" without an identification. Significantly, the photos then shown to the victim did not include a photo of the defendant. Some months later, she selected a photo that "resembled" her assailant from a photo array of eight bearded males. She did not positively identify that photo as that of her assailant stating that she "would have to see the person." This photo was, in fact, one of the defendant. Several months later, she "positively" identified the defendant as her assailant after she had viewed a videotaped lineup of six bearded males.

Despite the defendant's argument to the contrary, the remand court's finding that the victim had "ample opportunity" to view her assailant is supported by the record. The victim observed the assailant when she talked to him on the highway before he grabbed her bicycle. He "was facing towards [her]." Before she was assaulted, she had a conversation with her assailant, trying to calm him down as she endeavored to get out of the situation. Immediately before the assault, the

---

[8] It must be pointed out that the defendant's brief on remand claims that the remand court erred in not ordering suppression because of the state's "having *conceded* that the suspicious stranger in the white car *matched* the description of the assailant. . . . " Upon questioning at oral argument, defendant's counsel admitted that the state had not conceded that this description "matched" the assailant but that defense counsel had inferred that from one of the state's proposed findings. The state denied that it had made that concession.

defendant counted from one to ten and she was able to see his features during this time. During the course of the assault, she looked at his face because she "want[ed] to remember him." The victim also noticed that her assailant had short fingernails that looked as if they were chewed. The defendant's wife later testified that he "bites [his nails] and they are very short" and this is a "continuous habit" he has. It was daylight at the time of the assault and "light came through" the shed where the assault took place; she testified that "[i]t was lighter [in the shed] than this, the courtroom."

The record also supports the remand court's findings that the victim identified a photograph of the defendant as "resembling" her assailant, that she "positively identified" the defendant on a videotaped lineup and that she made a "firm in-court identification" of the defendant as her assailant. We note here that after the victim identified the defendant in court as her assailant, she testified that her in-court identification was made on the basis of the mental picture she had made of her assailant on October 18, 1981, the date of the assault.[9] In addition, the remand court's finding that the victim's description of her assailant "generally matched" that of the defendant is supported by the record.

---

[9] After she had identified the defendant at the trial as her assailant, the victim testified as follows:

"Q. What were you doing there with respect to identifying your assailant during the course of this incident?

"A. I was trying to get a mental picture of the person so if I got out of the situation I could identify him.

"Q. That was a conscious objective on your part; is that correct?

"A. Yes.

"Q. Did you do that—did you get that mental picture?

"A. Yes, I did.

"Q. Do you have it today?

"A. Yes, I do.

"Q. So, based on you mental picture that you obtained of your assailant back in October of 1981, you could identify him now?

"A. Correct.

"Q. Without any question?

"A. Correct."

The remand court also found that the defendant's car had been seen parked in the immediate area of the assault at about the time of the assault. The following evidence supports this finding: On the day of the assault, the defendant owned a 1975 dark green AMC Pacer car. Beverly Sternberg, an area resident, saw such a car parked on Grieb Road close to the Durham Road intersection "[a]round 5:00" on the day of the assault as she drove by. Roland Sperzel, a truck driver who hauled fill and made "[f]ifteen, twenty trips" between 1 and 6 p.m. that day going up Grieb Road or Durham Road, saw a '76 to '78 green Pacer parked on Durham Road near the Grieb Road intersection "in a place that usually they don't park." He saw a man with brown hair, of medium build, wearing jeans and a plaid flannel shirt walking away from it toward Grieb Road. Sperzel saw that car parked at that location three or four times that day.

Another important factual finding supported by the record is that the defendant's fingerprints were found on the victim's bicycle "in the place where the assailant grabbed the bicycle." The victim described where and how her assailant had grabbed the crossbar of her bicycle when he confronted her and how he had been positioned at that time. The Wallingford police processed her bicycle for latent fingerprints and identified one of the fingerprints as that of the defendant's left index finger. The Wallingford police then forwarded the other latent fingerprints to the F.B.I. latent fingerprint section in Washington. At the trial, an F.B.I. fingerprint specialist testified not only that the left index fingerprint was that of the defendant, but that the defendant's left middle and left ring fingerprints matched the prints found on the bicycle. He said that all three of these fingerprints, when compared with the defendant's known fingerprints, were "positively identified" with the latent prints taken from the victim's bicycle.

The remand court also found that the seminal stains on the victim's clothing contained a substance that was consistent with the defendant's blood type and the fact that he was a secretor. This finding is supported by the forensic evidence adduced at trial.

Although the remand court found that "the evidence contained in [the Isola] statement was that a man, not the defendant, whose description was similar to that of the assailant in some respects and dissimilar in others, was seen seated in a car which was not similar to the defendant's, in a field approximately one hour after the assault, and that the man appeared nervous and upset and drove off hurriedly when confronted," it, nevertheless, determined that had that evidence been presented to the trial jury, it would not have created a reasonable doubt in the minds of the jury as to the defendant's guilt. See *United States* v. *Bagley,* supra, 682–83. The determination of materiality has been said to be "inevitably fact-bound" and like other factual issues is committed to the trial court in the first instance. *United States* v. *Kelly,* 790 F.2d 130, 136 (D.C. Cir. 1986). We conclude that the remand court's factual determinations are adequately supported by the record. Our reference to the evidence on the *Brady* issue is not for the purpose of demonstrating that there was a strong case against the defendant but rather to demonstrate that the governing law on this issue, when applied to the factual findings made, does justify the result reached by the remand court and the trial court.[10]

---

[10] The defendant maintains that *Siemon* v. *Stoughton,* 184 Conn. 547, 440 A.2d 210 (1981), a case involving a sexual assault by a nude assailant, supports his claim that evidence showing that someone else, not the defendant, may have committed the crimes would have raised a reasonable doubt in the minds of the jury. We do not agree. In *Siemon* we said: "A defendant may give evidence concerning a third party's involvement with the crime, as long as there is some evidence which *directly connects* the third party with the crime." (Emphasis added.) Id., 555. We also pointed out in *Siemon:* "The unusual fact of encountering a nude man in the same area

In examining the remand court's conclusions of law, we keep in mind that *Brady* and its progeny are grounded in a defendant's right to due process and a fair trial. The court concluded, as a matter of law, that the defendant was not denied a fair trial and that the challenged evidence was not favorable and material to the defendant. Turning to *Bagley,* the remand court concluded that even had the Isola statement been disclosed, there was not a "reasonable probability" that the result of the trial would have been different and that statement would not have tended to lead the jury to entertain a reasonable doubt as to the guilt of the defendant. We agree with these conclusions.

In assessing these conclusions, we consider whether the "reasonable probability" formulation of *Bagley* was properly applied by the remand court. There is no question that *"Brady, Agurs,* and now *Bagley* call for 'retrospective examinations . . . as to whether a defendant's due process rights had been violated by the [state's] withholding of particular evidence.' " *Coleman* v. *United States,* 515 A.2d 439, 448 (D.C. App. 1986), cert. denied, 481 U.S. 1006, 107 S. Ct. 1631, 95 L. Ed. 2d 205 (1987), quoting *Lewis* v. *United States,* 408 A.2d 303, 306 (D.C. App. 1979). In evaluating the "reasonable probability" standard, we should be aware of what adverse effect the nondisclosure may have had on the defendant's preparation or presentation of his case and that we should act "with an awareness of the difficulty

on three occasions was enough to connect the nude man to the crime with sufficient directness to render the evidence admissible." Id., 556. *Siemon* is inapposite here. Although there were some similarities in appearance, the location of the man in the Isola statement approximately one mile from the crime scene about one hour after the crime in a car completely different from the defendant's car does not constitute evidence that "directly connects" a third party to the crimes. See *State* v. *Giguere,* 184 Conn. 400, 405, 439 A.2d 1040 (1981).

We need not address the defendant's allusion to an ineffective assistance of counsel claim; see *Siemon* v. *Stoughton,* supra; as that issue is not properly before us.

of reconstructing in a post-trial proceeding the course that the defense and the trial would have [otherwise] taken . . . . " *United States* v. *Bagley,* supra, 683. On the other hand, we must also recognize that the "mere *possibility* that an item of undisclosed evidence *might* have helped the defense or *might* have affected the outcome of the trial, however, does not establish 'materiality' in the constitutional sense." (Emphasis in original.) *State* v. *Mak,* 105 Wash. 2d 692, 704–705, 718 P.2d 407, cert. denied, 479 U.S. 995, 107 S. Ct. 599, 93 L. Ed. 2d 599 (1986). There is a difficulty inherent in measuring the effect of nondisclosure in the course of a lengthy trial with many witnesses and exhibits such as this; this lack of certitude suggests deference by a reviewing court especially in the weighing of evidence. *United States* v. *Pflaumer,* 774 F.2d 1224, 1230 (3d Cir. 1985), cert. denied, 475 U.S. 1046, 106 S. Ct. 1263, 89 L. Ed. 2d 572 (1986); see *United States* v. *Agurs,* supra, 114. Fortunately, the *Brady* issue was thoroughly developed on remand and the augmented record fairly presents that issue in full focus.

We agree with the remand court that the challenged evidence was not favorable and material to the defendant. Even if we assume, arguendo, that it was favorable, it certainly fell short of the materiality standard of *Bagley.* In light of the totality of evidence presented at trial, there was no reasonable probability that had it been disclosed, the result would have been different. There was not "a probability sufficient to undermine confidence in the outcome." *United States* v. *Bagley,* supra, 682. It follows that the trial court did not err in its rulings on this issue, including its denial of the defendant's motion for a continuance and a mistrial, and that the remand court's conclusions of law and findings of fact must stand.

## II

The defendant next claims that the trial court erred in its instruction to the jury on the elements of the crime of sexual assault in the first degree. The defendant argues that the trial court erred in instructing that in order to find the defendant guilty of sexual assault in the first degree, the state's only obligation was to prove attempted sexual assault in the first degree, thus lowering the state's constitutional burden of proof. We do not agree.

The state argues that this claim is not reviewable because the defendant did not except to the charge at trial on this ground. While ordinarily this omission would render the claim unreviewable, we will consider the issue because the failure adequately to instruct the jury on each essential element of the crime might result in a due process violation implicating the fairness of the defendant's trial. *State* v. *Kemp,* 199 Conn. 473, 480, 507 A.2d 1387 (1986); *State* v. *Sinclair,* 197 Conn. 574, 580–81, 500 A.2d 539 (1985); *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). "The extent of our review of a constitutional issue raised for the first time on appeal is limited. We must determine whether, 'considering the substance of the charge rather than the form of what was said, it is reasonably possible that the jury was misled.' *State* v. *Zayas,* [195 Conn. 611, 617, 490 A.2d 68 (1985)]." *State* v. *Sinclair,* supra, 581.

The defendant points to that portion of the instruction which stated: "If you find that the State has proved beyond a reasonable doubt that the accused did *attempt* to compel [the victim to] engage in sexual intercourse with him, had use of physical force, you will find him guilty as charged. If you do not so find, you will find him not guilty." (Emphasis added.) The defendant argues that having been charged with sexual assault

in the first degree, the challenged instruction utilizing the term "attempt" lowered the state's burden of proof on the crime charged in derogation of his constitutional rights. While we recognize that it is the state's constitutional burden to prove each essential element of the crime charged beyond a reasonable doubt; see *Mullaney* v. *Wilbur,* 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975); *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State* v. *Griffin,* 175 Conn. 155, 162, 397 A.2d 89 (1978); we are not persuaded by the defendant's argument.

The jury was adequately instructed on this crime and it is not reasonably possible that it was misled by the single inadvertent use of the term "attempt." When the jury was sworn in, the information charging this crime, as well as the kidnapping charge, was read to it; the information charged, inter alia, the commission of a completed sexual assault by force. Shortly before the court gave the challenged instruction, the court read the information to the jury. Immediately after reading the sexual assault count, it read the relevant part of the statute, telling the jury that General Statutes § 53a-70 (a) "states in part that a person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person which reasonably causes such other person to fear physical injury." The court instructed on the definition of sexual intercourse, including the requirement of penetration, "however slight." Immediately after giving the challenged instruction, it referred to the facts of the case, including the victim's very words, that after some preliminaries, the defendant "entered her and did so while using force." There was no dispute at trial as to the fact of a completed sexual assault. Additionally, although disputing the identity of the perpetrator, defense counsel does not deny that, on the evidence,

the perpetrator effected a completed sexual assault on the victim by vaginal intercourse accompanied by force. Moreover, the jury had the information with it in the jury room during deliberations. Considering the substance of the entire charge, we conclude that the jury was adequately instructed as to the crime of sexual assault in the first degree and that it is not "reasonably possible that the jury was misled." See *State* v. *Sinclair*, supra. There was no constitutional error in the instruction.

## III

The defendant next claims that the trial court erred in failing adequately to instruct the jury on the dangers of eyewitness identification and in marshaling the evidence in a manner that "constituted an additional closing argument for the state." The defendant timely excepted to the charge on these grounds.[11] On the identification instruction, the defendant points out that he filed two "alternative" requests,[12] neither of which the

---

[11] In his brief, the defendant's exceptions to the instructions on identification are set out as follows: "I indicate[ed] that I don't believe your Honor gave an instruction on identification which would have required the jurors to take into consideration the circumstances under which the complaining witness observed her assailant, the tensions of the moment. It did not indicate that they should take into consideration the circumstances under which photos were presented to her, the passage of time and how that might have affected her. The further passage of time between the showing of the photographs and the videotape. . . . "

The defendant also excepted that the "marshaling of the evidence [on both the kidnapping and sexual assault charges] did amount essentially to an additional closing argument by the State."

[12] The state argues that one of the identification requests does not apply because it suggests that expert testimony had been offered by the defense on this issue which did not occur in this case. That request which, in large measure, suggests the jury instruction formulation set out in *United States* v. *Telfaire*, 469 F.2d 552 (D.C. Cir. 1972), includes this language:

"Testimony has been offered through an eyewitness who claims to be positive of her identification. Additionally, the defense has offered testimony of the great dangers of error in such testimony. The testimony of a witness that she is positive of her identification may be considered by

court gave, and, in any event, that the instruction given was "legally inadequate." In addition, he argues that the only instruction on identification combined "an inadequate identification instruction and an erroneous marshaling of the evidence." The state, on the other hand, contends that the court's instructions fairly presented the case to the jury and resulted in no injustice to the defendant. It also argues that the trial court's comments on the evidence were proper. We agree with the state.

After viewing the charge as a whole, we conclude that, despite the defendant's claim to the contrary, the court's instructions acted as a sufficient guide to the jury on the issue of identification. The instruction on identification to which the defendant refers contains the following language: "I have mentioned that the burden of proof is at all times upon the State to prove beyond a reasonable doubt all of the essential elements of the crime. One of those elements is, of course, the identification of the accused as the person who committed the crime. So that even though you find that a crime was committed, you must be satisfied beyond a reasonable doubt that this accused committed that crime before you may find him guilty of committing that crime." In addition to this instruction, the court also instructed the jury that "it becomes important for you to note, to observe the attitude and demeanor of the witness on the stand to form from the evidence what opinion you can as to their powers of observation, judgment and discernment." The court also stated that it "must" tell the jury that the number of witnesses

you, but is not binding upon you. Certainty does not necessarily mean accuracy. You have the duty to carefully consider that testimony and to reject it if you find that it is not reliable. You must find David Pollitt not guilty if there is any reasonable doubt that he was the person who committed the crimes.

"Additionally, the defense has offered testimony of the great dangers of error in such testimony."

testifying to a fact was not controlling but that it was "the quality and not the quantity of testimony which controls." In instructing the jury to consider any possible bias or prejudice a witness may have "for or against the State or for or against the accused," it told the jury to consider, inter alia, "[h]is or her ability to observe facts correctly and to remember and to relate them truly and accurately." Still later, the court, immediately prior to instructing on the two crimes charged, iterated that it was the jury's function to "decide what witnesses you will believe and what part of the evidence you will believe." The court also stated that "[t]he element of time, opportunity of observance by witnesses, the credibility of witnesses and their interest in the case, if any, are some of the elements that should be considered by you." In commenting on the victim's evidence bearing on this claim, the court said, "she described . . . [t]hat she was frightened to death and thoroughly shaken as would be natural under the circumstances as she described." This focused the jury's attention on the stress or tension the victim had said she experienced during these crimes.

There was no error in the trial court's failure to charge on identification in the language of the requests. One of the requests was inappropriate in the sense that it not only indicates in two places that expert evidence was offered by the defendant on the dangers of eyewitness testimony, but also contains portions of the *Telfaire* formulation; see *United States* v. *Telfaire,* 469 F.2d 552 (D.C. Cir. 1972); which this court has not required to be given. The other request contains matter that is not to be given and it contains no citation of authority upon which it is based. See Practice Book § 854. In any event, examining the charge, as a whole; see, e.g., *State* v. *McKnight,* 191 Conn. 564, 582, 469 A.2d 397 (1983); the instructions involving identification to which we have referred furnished sufficient

guidance to the jury on this issue so that no injustice was done to the defendant. While a trial court should give particular attention to instructing on the dangers of misidentification where that element is critical, there was other significant evidence in this case going to the identification issue that supports our conclusion that the instructions as given were not "legally inadequate" as claimed.

The defendant joins a claim of "an erroneous marshaling of the evidence" with his claim of "an inadequate identification instruction." Specifically, the defendant argues that the trial court's comments to the jury amounted to "an additional closing argument for the state." We disagree. The trial court may, in its discretion, make reasonable comments on the evidence. *State* v. *Taylor,* 196 Conn. 225, 232, 492 A.2d 155 (1985); *State* v. *Schoenbneelt,* 171 Conn. 119, 124, 368 A.2d 117 (1976). The comments, however, should be fair, must not advise the jury how to decide the case or amount to a direction of a verdict but must present the case in its proper focus. *State* v. *Taylor,* supra; *State* v. *Storlazzi,* 191 Conn. 453, 465, 464 A.2d 829 (1983); *State* v. *Schoenbneelt,* supra. "It is within [its] discretion to call attention to certain evidence and to comment upon it." *State* v. *DeMatteo,* 186 Conn. 696, 705, 443 A.2d 915 (1982); *State* v. *Mullings,* 166 Conn. 268, 274, 348 A.2d 645 (1974). This discretion, while wide, must fairly present the issues to the jury. *State* v. *Taylor,* supra; *Bruneau* v. *Quick,* 187 Conn. 617, 628, 447 A.2d 742 (1982).

We have had occasion recently to say: " 'Within constitutional limitations concerning trial by jury, the nature and extent of the trial court's comments on the evidence must largely depend on the facts involved in a particular case and the manner in which it has been tried. . . . While a trial court has not only the right but often the duty to comment upon the evidence . . .

it is not licensed to "indulge in an argumentative presentation of the claims of one side." . . . In a word, " '[i]nstructions should not be so drawn as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over portions of the testimony on the other side which deserve equal attention.' " ' (Citations omitted.) *Bruneau* v. *Quick,* [supra]; see also *State* v. *Cari,* 163 Conn. 174, 303 A.2d 7 (1972)." *State* v. *Reid,* 193 Conn. 646, 663, 480 A.2d 463 (1984). In *Reid,* the defendant claimed error in the court's comments on the evidence suggesting an "unbalanced review" of the evidence in its extensive comment. There we noted that the case had lasted approximately eleven days, not including a three day weekend at midtrial, that numerous witnesses had been called to resolve conflicting accounts about the shooting involved and that the jury had to consider two degrees of culpability. We said that under the circumstances of *Reid,* "the court properly commented extensively on the evidence presented." Id., 664.

Within the context of these principles, we have examined the entire charge in the light of the evidence adduced on the issues presented to the jury for its determination. First, we note that the trial in this case took place over six days with at least two long weekends intervening. At the trial, the state presented fourteen witnesses and the defendant presented twelve. Fifty exhibits were admitted into evidence. Under the circumstances, it was not improper for the trial court to comment extensively on the evidence presented. See id. It is true that the trial court made a few minor misstatements with reference to the evidence, but they were not of great significance. Presumably, they were cured by the court's charge, not once but several times,

that the jury's recollection of the evidence controlled.[13] See id.; *State* v. *Taxiltaridis,* 2 Conn. App. 617, 621–22, 481 A.2d 98 (1984).

The court fairly and adequately told the jury that it, not the court, decided the facts and that the court's concern with the evidence was only "to put [the evidence] in context with the law as I give it to you." Although the recounting of the evidence was extensive, we cannot conclude that the trial court's comments either advised or directed the jury how to decide the case. We are aware that instructions should not contain "improper remarks which are indicative of favor or condemnation"; *State* v. *Echols,* 170 Conn. 11, 14, 364 A.2d 225 (1975); or are " ' "argumentative." ' " *State* v. *Reid,* supra, 663. We cannot say that the court's marshaling of the evidence was erroneous on that basis. Fair comment does not become improper merely because it tends to point out "strengths, weaknesses, or difficulties of a particular case." See *State* v. *Echols,* supra. Fair comments may also include comment on the credibility of witnesses, including alibi witnesses; this, we note, did not occur here. See *State* v. *Cari,* supra, 182.

We also do not agree with that part of the defendant's exception which stated: "I don't believe you marshaled the evidence as presented by the defense in any way, shape or form similar to the way it was marshaled . . . ." The defendant claimed both misidentification and alibi. A fair reading of the defense presentation of its evidence shows that the testimony of all the wit-

---

[13] For example, immediately after it had concluded its comments on the evidence, the trial court told the jury: "So I recited the facts for you to focus in on this law that I have given you and my recollection in no way controls upon you. That is clearly your function, as I have told you on several occasions, and not mine."

Earlier in its charge, the trial court had said: "I will say this now and I will probably repeat it several times. It is your recollection of the facts that controls and not mine. I will refer to various pieces of evidence solely to put it in context with the law as I give it to you."

nesses except one went to the misidentification and alibi claims. The defendant's wife and a neighbor in Clinton were put on to show that the defendant had been in Clinton at the time of the assault. His wife also testified that his green Pacer car had been in Clinton at that time. The greater number of his remaining witnesses testified, inter alia, about the presence or absence of a green Pacer car in the area of the crime that day.

The trial court's instructions covered both claims. The court stated: "The defense, of course, claims that that car wasn't there at all. They claim that the car was out in Hamden in the morning where they rented another truck and the Defendant drove it home to Clinton. That the car was out in Clinton the rest of the day and night and was never in Wallingford." It then referred by name to four defense witnesses and commented on their evidence about the presence or absence of the green Pacer car in the crime area. It then charged the jury on alibi. The defendant's wife and a neighbor, who was a personal friend of the Pollitts, testified concerning the defendant's presence in Clinton at the time of the crimes. In doing so, the court did not comment on their testimony. At the time the defendant took his exception on his marshaling claim, the following took place:

"The Court: All right. Your exceptions are noted. I might say I deliberately did not talk about Mrs. Pollitt's testifying when I gave the alibi charge. I did that because I decided not to. I thought it might tend to belittle her testimony. I did not refer to it.

"Mr. Dow: My recollection is you referred to friends or relatives.[14]

[14] The court and counsel were apparently referring to that part of the charge on alibi wherein one of the considerations pointed out to the jury in considering a claim of alibi was: "Frequently evidence relating to a

"The Court: That's right. That is exactly why I did not mention her testimony. I thought it might underline it. I deliberately refrained from commenting when I gave the alibi charge. . . ."

We believe not only that the jury was charged on the claims of defense advanced, but also that the evidence relating to those defenses was fairly commented upon. We have said that "[t]he primary purpose of the charge is to assist the jury in applying the law correctly to the facts which they might find to be established." *State* v. *Sumner,* 178 Conn. 163, 170, 422 A.2d 299 (1979). We cannot say that, as a matter of law, the jury instructions erroneously marshaled the evidence as claimed. The court's comments on the evidence were not "an additional closing argument for the state."

### IV

The defendant next claims that the trial court erred in admitting evidence of his blood type because "the prejudicial effect of [that evidence] outweighed its probative value" and that "[t]he evidence was too speculative and too remote to have any probative value at all." In support of this claim of error, the defendant points out that his blood type, which was determined from forensic tests to be the same type as that found in stains on the victim's underwear, was also the same blood type as the victim's boyfriend with whom she admittedly had had sexual relations on the morning of the assault charged in this case.[15] We find no error in this ruling.

In pressing this claim, the defendant places great stress on *People* v. *Robinson,* 27 N.Y.2d 864, 265

claimed alibi will consist in part at least of testimony of witnesses who are related to or are friend[s] or associates of the accused and who may therefore be held to be in a greater degree interested."

[15] The forensic evidence on blood sampling also indicated that both the defendant and the victim's boyfriend were also "O" secretors.

N.E.2d 543, 317 N.Y.S.2d 19 (1970), which excluded evidence of type "A" blood as having no probative value in view of the large portion of the general population having blood of the same type. Since the filing of the defendant's brief, the New York Court of Appeals has rejected the *Robinson* rule in *People* v. *Mountain,* 66 N.Y.2d 197, 202, 486 N.E.2d 802, 495 N.Y.S.2d 944 (1985), noting that "in other jurisdictions [it] has been universally rejected" and "has been criticized by noted scholars (see, e.g., McCormick, Evidence [(3d Ed.) § 205, p. 619]) . . . . " In *People* v. *Mountain,* supra, the New York Court of Appeals also stated: "When identity is in issue, proof that the defendant and the perpetrator share similar physical characteristics is not rendered inadmissible simply because those characteristics are also shared by large segments of the population." The view is practically universal that such blood grouping evidence is admissible on the issue of the identity of a claimed perpetrator of crime. See, e.g., *United States* v. *Kelley,* 526 F.2d 615, 622 (8th Cir. 1975), cert. denied, 424 U.S. 971, 96 S. Ct. 1471, 47 L. Ed. 2d 739 (1976); *United States* v. *Kearney,* 420 F.2d 170, 171 (D.C. Cir. 1969); *People* v. *Lindsey,* 84 Cal. App. 3d 851, 862, 149 Cal. Rptr. 47 (1978); *Allen* v. *State,* 248 Ga. 676, 681, 286 S.E.2d 3 (1982); *Shanks* v. *State,* 185 Md. 437, 439, 45 A.2d 85 (1945); *State* v. *Gray,* 292 N.C. 270, 283, 233 S.E.2d 905 (1977).

We have pointed out that "[e]vidence is not rendered inadmissible simply because it is not conclusive. It is admissible if it tends to support a relevant fact even in a slight degree, so long as it is not prejudicial or merely cumulative." *State* v. *Morrill,* 197 Conn. 507, 548, 498 A.2d 76 (1985). Realistically, as *Mountain* points out, it "appears that the only justification for excluding such evidence is a fear that the jury may accord it undue weight, beyond its probative value, because of its scientific basis . . . ." *People* v. *Moun-*

*tain,* supra, 203. We agree with the view expressed in *People* v. *Mountain,* supra, that that danger "can generally be avoided by instructions, where requested, emphasizing . . . that it is only circumstantial evidence and noting, perhaps, the percentage of the population involved." Moreover, where the defendant can actually show that the potential prejudice outweighs the probative value, the court has discretion to exclude such evidence.

## V

Finally, the defendant claims that the trial court erred in denying his motion to suppress the victim's photographic and videotape identifications. He claims that the identification procedures employed were so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. Pointing, inter alia, to the evidence of her frightened condition, her limited opportunity to view her assailant, the time frames involved and the circumstances surrounding the identification procedures, he contends that suppression was warranted. We do not agree.

Shortly after the assault, the victim was shown numerous mugshots ("at least two hundred, perhaps more") but was unable to make an identification. The defendant's photo was not among those shown to the victim at this time. She also was not satisfied with a composite drawing made of her assailant. On April 22, 1982, six months after the assault, the victim was shown an array of eight photos of bearded males. The victim selected photo No. 417, stating that it "resembled" her assailant but that she could not positively identify him from a photograph and that "[she] would have to see the person." Photo No. 417 was a photo of the defendant. A number of days later, the victim was shown photo No. 417 again. On August 5, 1982, the victim went to the Wallingford police department

and viewed a videotaped lineup of six bearded males. She immediately identified the fifth person, the defendant, as her assailant.

"We have recently reiterated that ' "[i]n determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive, and second, if it is found to be so, it must be determined whether the identification was nevertheless reliable based on an examination of the 'totality of the circumstances.' " ' *State* v. *Ramsundar,* 204 Conn. 4, 10, 526 A.2d 1311 (1987), quoting *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980); see also *State* v. *Cubano,* 203 Conn. 81, 93, 523 A.2d 495 (1987); *State* v. *Collette,* 199 Conn. 308, 310, 507 A.2d 99 (1986); *State* v. *Hinton,* 196 Conn. 289, 292–93, 493 A.2d 836 (1985). ' " ' "A defendant who moves to suppress identification evidence bears the initial burden of proving that the identification resulted from an unconstitutional procedure." ' . . ." ' *State* v. *Cubano,* supra; *State* v. *Hinton,* supra, 293; *State* v. *Fullwood,* 193 Conn. 238, 244, 476 A.2d 550 (1984). To prevail in his claim 'the defendant must demonstrate that the trial court erred in *both* of its determinations regarding "suggestiveness" and "reliability" of identifications in the totality of the circumstances.' (Emphasis in original.) *State* v. *Hinton,* supra." *State* v. *Mayette,* 204 Conn. 571, 581, 529 A.2d 673 (1987).

"The presentation of an array of several photographs to witnesses, including that of the suspect, does not constitute an impermissibly suggestive pretrial identification procedure 'in the absence of any unfairness or other impropriety in the conduct of the exhibit.' " *State* v. *Boscarino,* 204 Conn. 714, 726, 529 A.2d 1260 (1987). The defendant claims, however, that the array from which the victim made a tentative identification was

unnecessarily suggestive not only because the defendant's photo "was the only Polaroid in the array," but also because in showing the photos to the victim, the police officer indicated that there was a suspect among the photos. The defendant also points out that, although the victim had described her assailant as having a mustache and having hair parted in the middle, the photos in the array were all of bearded males, none with hair parted in the middle. We are not persuaded.

The record does not support the defendant's claim that the array was unnecessarily suggestive. Both Detective Patricia Miranda and Detective Theodore Milewski, who were involved in showing photos to the victim, testified that they did not tell the victim that a "suspect's" picture would be in the array. In addition, the victim testified that prior to selecting the defendant's photo, she had not noticed that it was a Polaroid and that the fact that it was a Polaroid had played no part in her selection. Moreover, the victim testified that her selection of the defendant's photograph was her own decision based on her recollection of the assailant on the date of the assault. Despite the defendant's argument to the contrary, the procedures used were not unnecessarily suggestive.

The defendant also argues that the subsequent videotaped lineup was unnecessarily suggestive. In support of this claim, the defendant points to the single photo of the defendant shown to the victim between the time of the array and the time of the videotaped lineup, as well as the fact that the victim expected to see the person whose photo she had previously identified in the videotaped lineup and acknowledged that none of the others in the photo array were present in this videotaped lineup. The victim's assumption that the person whose photograph she identified would be in the lineup is "one which would naturally arise under the circumstances, and, in itself, [does] not render the [video-

tape] identification impermissibly suggestive." *State* v. *Boscarino,* supra, 730. The defendant does not claim that the police officer actually told the victim that the suspect would be in the lineup. The victim also testified that in her selection of the defendant in the videotape, she was not looking to identify the person she had selected in the photo array but instead was attempting to identify her assailant. This testimony militates against the defendant's claim that the videotape identification was the product of the earlier photographic identification. See id. The videotaped lineup was not unnecessarily suggestive.

If we assume, arguendo, that the identification procedures were unnecessarily suggestive, we conclude that the identifications were reliable under the totality of the circumstances. " 'In determining whether an identification is reliable in the "totality of circumstances," the corruptive influence of the suggestive procedure is weighed against "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977) . . . .' *State* v. *Cubano,* supra, 95; *State* v. *Collette,* supra, 311 n.3; *State* v. *Hinton,* supra, 295–96." *State* v. *Mayette,* supra, 583.

Based on the totality of the circumstances, the victim's identifications were reliable. The victim had ample opportunity to view the defendant at the time of the crime. She had spoken to him out in the road, prior to the assault, for "one or two minutes" as she answered his questions about directions. At that time, he was "[a] foot away, maybe two." She had no problem seeing in the shed where the lighting had been better than in the courtroom. At this time, "[h]e was above me and

face to face." Although she had been frightened, she "want[ed] to remember him," she "was trying to get a mental picture of [him] so if [she] got out of the situation [she] could identify him." There was a "conscious objective" on her part to get a "mental picture" of him. The victim gave a detailed description of her assailant to the police; it included both his physical characteristics and his clothing. Although the defendant points out that the description was dissimilar to his appearance with reference to the claim that the assailant's hair was parted in the middle, that his mustache was trimmed and there was no mention of his eyebrows, her description of the assailant as to his race, approximate age, height, build, complexion, the odor of cologne, roundish face, short fingernails as if chewed, brownish plaid flannel shirt, jeans and white sneakers has not been seriously challenged. Her level of certainty was high. She first viewed at least two hundred mugshots and perhaps more without making an identification; the defendant's photo was not among those photos. Upon viewing the photo array she selected the defendant's photo from the eight photos. She could not make a positive identification from this photo, saying that it "resembled" her assailant and that she "would have to see the person [whose photo she had selected]." Still later, upon viewing the videotaped lineup, she "immediately" and "positively" identified the defendant as her assailant. Moreover, at trial, she "positively" identified the defendant. She said that she did so because of her present recollection of her assailant based on her mental picture of him in October, 1981. The evidence adequately supports our conclusion that the identification of the defendant was reliable under the "totality of circumstances." See *Manson* v. *Brathwaite,* supra, 114.

There is no error.

In this opinion the other justices concurred.