[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM FILED MAY 8, 1997
This matter has been extensively briefed and argued by both sides. The court in this memorandum will focus on two major issues and will determine the amount of punitive damages. The court will not discuss each and every issue raised by the defendants particularly the evidentiary rulings and the appropriateness of allowing rebuttal testimony by the plaintiff. Each one of these matters consumed pages and pages of transcript testimony and argument. The court is not persuaded that it erred CT Page 5096 in the conclusions it reached and the arguments raised by the defendants now were raised previously at trial. More importantly, the court is not persuaded that if error was made on these matters the error was of sufficient magnitude to change the result of the trial. It is also true that although the court does not in any way mean to imply that the defendants are not pressing these issues, by far the greatest portion of the briefing and oral argument on the post trial matters concerns the issues which the court will now discuss.
QUALIFIED IMMUNITY AND RELATED CLAIMS
The defendants strongly argue that their motion should be granted because failure to do so would deprive them of the defense of qualified immunity on the federal claims.
The defendants also argue that there was no basis in law for the jury verdicts returned. Under both state and federal law, an arrest warrant does not give rise to civil liability unless probable cause to arrest no longer exists after correction for material omissions and/or for material falsehoods associated with the arrest warrant affidavit.
Furthermore, the defendants argue that there can be no civil liability unless the jury finds that any material omissions or material falsehoods resulted from intentional action by the police or reckless disregard. The defendants claim there was no basis in the evidence for the jury to reach such a conclusion.
Also, although counsel for the defendants took no exception to the charge as given, it is now claimed that the court erred in failing to give a requested instruction informing the jury as to what was "material" and what was not "material" on the issue of probable cause and whether it could be found.
The Court rejects these positions taken by the defendants and rests its decision on the conclusions and interpretations of law involved in its discussion of the qualified immunity claim. The notion of what is "material," the officer's perspective or position when it was decided to place or not place certain information in the warrant, the decision that must be made by the jury and the standard it must use, are all intertwined in the qualified immunity question. The court concludes the instructions adequately informed the jury of the factors it had to consider, gave them an operating definition of materiality, and allowed CT Page 5097 them to conclude, given the facts of this case, whether material omissions in this matter were made intentionally or with reckless disregard.
As will be discussed, the court concludes the evidence was such that this case should have been submitted to the jury: that being the case the court will not substitute its judgment for that of the jury on these related issues.
An analysis of two cases is important to a resolution of the claims made by the defendants on their motion to set aside the verdict; Cartier v. Lussier, 955 F.2d 841 (CA2, 1992), and Golinov. City of Haven, et al., 950 F.2d 864 (CA2, 1991). Cartier
doesn't mention Golino let alone overrule it so that it seems to make sense to try to harmonize their results for an understanding of federal law on the issue of qualified immunity and the matters just referred to. The Golino court says at 950 F.2d page 870:
 The qualified or "good faith" immunity enjoyed by police officers shields them from personal liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known . . . or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights."
The real question is what test is applied to determine the scope of the protection just discussed. Cartier says that summary judgment should be granted[1] on the basis of qualified immunity in an arrest warrant case "if the affidavit accompanying the warrant is sufficient, after correcting for material misstatements or omissions, to support a reasonable officer's belief that probable cause existed," id. pages 845, citingMagnoti v. Kuntz, 918 F.2d 364, 368 (CA2, 1990).
The Golino court poses the problem very succinctly for the judge deciding a motion for summary judgment or weighing a motion for a directed verdict, given the just mentioned premises, see 950 F.2d page 870.
 In order to be entitled to summary judgment on such a defense (qualified immunity), the officer must adduce sufficient facts that no reasonable jury, looking at the evidence most favorable to and CT Page 5098 drawing all inferences favorable to, the plaintiff could conclude that it was objectively unreasonable for the officer to believe that probable cause did not exist.
The very making of a judgment like this requires the court to look only at material facts — facts, in the context of a particular case, that have a bearing on whether an officer has in fact made a reasonable decision as to the existence of probable cause.
In defining what facts are material the Golino court at 950 F.2d page 871 said:
 Whether an item of information is material or not is, in the context of a motion for summary judgment, a mixed question of law and fact . . . The legal component depends on whether the information is relevant to a given question in light of the controlling substantive law . . . The factual component requires an inference as to whether the information would likely be given weight by a person considering the question.
Having ascertained what facts are "material" the court in weighing a motion for a directed verdict then decides whether those facts which the jury could reasonably be said to have found are such that the court can conclude as a matter of law that no reasonable jury could conclude that it was objectively unreasonable for the officer to believe that probable cause did not exist.
Legal formulas and references to definitions of"materiality" in the Brady v. Maryland, 373 U.S. 83 (1903), State v. Pollitt,205 Conn. 132, 142 (1987), contexts are not helpful and only add another layer of complexity to an already difficult job. To decide materiality in the context of a case such as this, the facts in question must be examined in light of the particular case. An examination of the facts considered by the court inCartier and Golino is helpful in defining what facts are material and why the two courts reached different results — not on the basis of the application of different legal standards but on the basis of different types of facts.
In Cartier the plaintiff was arrested as a result of her CT Page 5099 alleged involvement as the driver of a motor vehicle in a fatal automobile accident. After the charges were disposed of the plaintiff brought suit against the arresting officer. The police officer had the statement of a neutral eyewitness that implicated the plaintiff in a fatal auto accident. The officer also had physical evidence based on the damage to one of the vehicles and an accident reconstruction report that corroborated his determination that the plaintiff was driving and not the passenger who died as a result of injuries suffered in the incident and who the plaintiff said was driving. These are certainly material facts: identity of the actual driver of the car was critical on the issue of probable cause to arrest and certainly this is the type of information that would be given weight by an officer deciding whether he or she had reason to believe there was probable cause for arrest. The facts that the plaintiff argued made the officer's decision unreasonable were statements from her mother that five minutes before the accident the plaintiff left her house and was not driving, the statement of a brother that the plaintiff was not driving, the statement of a friend who changed his story after the warrant for the plaintiff was issued and the fact that hair sample testing was inconclusive. The Cartier court ruled on a motion for summary judgment based on this factual context.
The test applied by Cartier was not different from the one used in Golino. All of the facts just discussed were material. If the probable cause affidavit is corrected for intentional or reckless misstatements and if omissions such as the facts in the plaintiff's favor just discussed are added to the warrant, the court then asks according to Cartier, would no reasonably competent state trooper have sought an arrest warrant? TheCartier court said, reviewing all these facts "reasonable troopers, at the very least, could well disagree whether or not probable cause existed. That being the case, the court held qualified immunity is established as a defense as a matter of law and the district court should have granted summary judgment. SeeCartier, 955 F.2d at pp. 846-47.
The facts in Golino were of a different type. The material facts there also went to the issue of identity of the person who committed the murder in that case. The court found numerous facts were intentionally withheld from the probable cause affidavit. The court notes most of the neutral eyewitnesses described the killer as thin and clean shaven whereas Golino was heavyset and wore a mustache. The person who said the killer had a mustache CT Page 5100 identified someone else and not Golino. The prime accuser made statements inconsistent with those she was referred to as having made in the warrant affidavit and recanted the statements attributed to her in the affidavit. Prints the police believed belonged to the killer did not match Golino. The police knew the killer's blood type but declined to test Golino for his blood type. 950 F.2d at pp. 871-72.
The Golino court held that the district court based on these facts correctly held that "it could not rule as a matter of law that it was objectively reasonable for (the officers) to believe there was probable cause to arrest and prosecute Golino." Id.
page 872. In other words, the Golino court applied the test previously mentioned which refers directly to the jury function and the plaintiff's constitutional right to a jury trial which I take it is no less an important societal value than appropriate recognition of qualified immunity defenses in suits against the police — that test, applied by the court, is that an officer can rely on the qualified immunity defense to secure summary judgment or a directed verdict if no reasonable jury looking at the evidence in the light most favorable to, and drawing all inference most favorable to, the (arrested person) could conclude it was objectively unreasonable for the officer to believe that probable cause did not exist. 950 F.2d at p. 870.
The reasoning of Cartier and Golino must now be applied to the case before the court. In this case, certainly identity of the person who shot the victim was directly in issue and facts going to establish that were material. Various matters were not included in the probable cause affidavit that were material because they were facts which "would likely be given weight by a person considering the question" of probable cause. Golino,950 F.2d at p. 871. The plaintiff, Eric Ham, is well over six feet tall. Not included in the warrant is the fact that neutral eyewitnesses to the shooting told the police right after the shooting that the killer was 5'7" or 5'8." The warrant affidavit referred extensively to the statement of one individual who said he observed the shooting from the porch of a house and indicated he identified the plaintiff who was well known to this witness and who went to school with him. The affidavit did not mention the fact that this same witness had given two previous statements in which he did not identify the plaintiff; in the earliest statement he stated the shooter was 5'5" or 5'6" which corroborated estimates of height given by other witnesses. In that earlier statement, this individual said the shooter had a CT Page 5101 type of a mask on as did one of the neutral witnesses.
Another individual, Mr. Davis, who was referred to in the affidavit was quoted in the warrant as being with the plaintiff at the time of the shooting. He said that the gun went off accidentally when the plaintiff was playing with it. What is not mentioned in the warrant is that this witness at one point in his statement to the police said the gun held by the plaintiff went off while he was sitting in the car. He later, in response to further police questioning, seems to say the plaintiff got out of the car. But his earlier explicit statement that the plaintiff remained in the car would very likely be given weight by a person seeking to determine probable cause since such a statement would contradict every other witness to the shooting as to the location of the shooter and this witness statement was important corroborative testimony to the only other key witness referred to in the affidavit who had identified the plaintiff as the shooter but who had first given two statements that had not implicated the plaintiff.
Also not mentioned in the warrant was the fact that two jail inmates had reported to the police — one of whom was a relative of the victim — that another individual at the jail (not the plaintiff) had admitted to and bragged about doing the shooting. The police did interview two inmates at the jail and during trial did give reasons as to why the statements of this person claiming to have done the shooting were not considered credible. He appeared to be a braggart who magnified the seriousness of the charges he was being held on and the amount of his bond. Certainly failure to do further investigation into this matter does not equate with the failure to follow up on investigating leads in the Golino case. But it is true that the simple expedient of interviewing this person or putting his picture in a photo display for witnesses to the shooting was never taken by the police.
This is a close case but, given the facts referred to and correcting the affidavit as a discussion of those facts, would seem to dictate the court cannot say as a matter of law that it was objectively reasonable for the police to believe there was probable cause for the plaintiff's arrest.
The factor that makes this case more like Golino than Cartier
and what distinguishes the latter two cases from each other is this: in Cartier there was fairly unimpeachable evidence from CT Page 5102 neutral sources that tied the suspect to the crime — an eyewitness with no knowledge of any of the parties who, right after the accident, gives a statement against the plaintiff, independent forensic evidence based on damage to the car and an accident reconstruction report. In a case such as that, contradictory statements from others, especially if they are from relatives or friends, are only "impeachment" material in the Brady v.Maryland, supra, State v. Pollitt, supra sense and the qualified privilege would not be defeated if such facts were not included in the probable cause affidavit — it would not be unreasonable for an officer to conclude there was probable cause, it could not be said no reasonably competent officer would have sought a warrant.
In Golino as in this case not only was there evidence that the plaintiffs were not involved in the crime but the evidence actually relied on for probable cause statements from others was itself suspect — contradictory or inconsistent statements given by witnesses who actually tied the arrestee to the crime. Then the evidence that contradicts the probable cause conclusion cannot be brushed off as mere "impeachment" material — whatever that means in the context of these cases — but becomes material and a case for the jury to decide. The specter of a ruling such as this limiting the freedom of police activity is always a concern. But it seems to the court that experienced officers in close cases can easily protect themselves by the simple expedient of disclosing exculpatory information and considering these factors themselves. This would lead to better arrests and even avoid the powerful cross examination police are sometimes exposed to at trial when it is brought to the attention of the jury that exculpatory leads and information were not fully considered.
In any event, based on the foregoing reasoning, the court will deny the motion insofar as it raises the qualified immunity defense and the foregoing discussion also leads the court to reject the other arguments raised by counsel. There was enough evidence for the jury to conclude civil liability was established and that given the facts here the officers had the requisite mental intent.
There is another factor that should be mentioned by the court. As has been noted a Mr. Davis was referred to in the warrant as saying he was in a car with the plaintiff and that the shooting occurred when the plaintiff's gun accidentally discharged. Mr. Davis was called by the plaintiff as a rebuttal witness. Mr. Davis testified about the nature of the questioning CT Page 5103 process which resulted in his statement. Objection was made to his testimony; the court exercised its discretion to allow this rebuttal testimony. The court will not review that decision now. However, the testimony was presented after the defendants' motion for directed verdict. In light of that, it might be considered inappropriate for the court to consider that testimony on this motion and the court has not done so, Wood v. Bridgeport,216 Conn. 604, 607 (1990).
However, if it were appropriate to consider this testimony it might provide added reason to deny the qualified privilege claim and the argument that civil liability was not established. The jury could have found that while Davis was being interviewed at the police station, an officer slammed his hands on the table, indicated he would go away for life, said the plaintiff was pinning the crime on him. Mr. Davis. One does not have to even reach the issue as to whether these were appropriate questioning procedures to conclude that when such tactics are used the reliability of any such statement implicating a suspect ought, under certain circumstances, to raise doubt for an officer trying to determine the reasonableness of a probable cause conclusion. The circumstances here were that this witness, at least at one point in his interview, located the shooter inside a car where no other witnesses placed him, and he was, as noted, the only corroborating witness of another witness who had given three statements, only the last of which implicated the plaintiff.
In any event, the court will deny the qualified privilege claim and the other claims previously mentioned and does so without considering the Troy Davis rebuttal testimony.
DAMAGES
(1)
The court agrees with the defendants that the total award for compensatory damages in this case for all counts state and federal was $100,000. In the explanation of the verdict forms the jury was informed that there would be one award for compensatory damages which would be reflected in total on each of the plaintiff's verdict forms in the full amount. That this was the understanding is the fact that there was nothing in the evidence nor was there anything in the closing arguments referring to the evidence to indicate separate types of compensatory damages were or could be claimed for each of the theories of liability. CT Page 5104
(2)
The defendants claim also that on the constitutional claims there can be no multiplication of punitive damages "merely because the act or omission of misconduct happens to fortuitously and coincidentally support more than one violation of the law," page 24 of April 29, 1996 brief. Defense counsel's brief argues that "at most the awards of punitive damages should be limited to one award of $200,000 against each officer — one such award against each officer for the combined violations of federal false arrest and federal malicious prosecution also subject to remittitur" (also at page 24 of brief). The brief seems to concede that the jury in fact awarded $200,000 against each officer pursuant to the court's instruction so that subject to the remittitur claim the total award for punitive damages on the federal claims should be, if remittitur were not granted, $400,000 — $200,000 for each officer and not $800,000, $200,000 on each federal claim against each of the two officers.
A difficult issue to the court is the one raised by the defendants to the effect that the wrongdoing found by the jury here constitutes one set of common facts or circumstances and the federal constitutional claims although having different legal elements and thus not subject to merger really arise out of the same set of facts. Thus the defendants argue it would not be fair to award against each officer multiple punitive damages, that is $200,000 for violation of one constitutional claim, malicious prosecution, and $200,000 for violation of the second constitutional claim, false arrest. The defendants merely say they can find no authority that would allow such a result — the implication being also that there is no authority forbidding such a result. The plaintiff seems to argue there are two separate constitutional claims, the purpose of punitive damages is to punish transgressors for their wrongs so a multiple damage award is permissible. This on the other hand is somewhat conclusory.
But the court believes what is relevant is the distinction between the two federal constitutional violations. For malicious prosecution the jury need only find that the police knew or should have known there was no probable cause for a person's arrest. As to this element a jury could find it established even if a policeman had a sincerely held suspicion a person was guilty of a crime but procured his arrest knowing there was no probable cause for it. On a false arrest claim under the facts of this CT Page 5105 case the jury was instructed and could be taken to have found from their verdict that the officers submitted a warrant to a judge knowing the affidavit contained material omissions or misleading assertions. That is an entirely different and added finding which this court cannot conclude the jury had no right to attach some significance to and thus could not take into account in awarding punitive damages on each federal constitutional claim.
Since this discussion is directly related to the remittitur claim the court will discuss that issue at this point. For reasons set forth in Stebbins v. City of New Britain, 12 CONN. L. RPTR. 48 (1994), this court is very reluctant to disturb jury damage awards because such awards are inextricably tied to a plaintiff's right to a jury trial.
The award for compensatory damages here is not exorbitant in light of what conclusions this jury necessarily reached. They knew the charges brought against the defendant were terminated in his favor. They knew he had been incarcerated several months and they had to have concluded there was no basis for the arrest. Such events would necessarily cause pain and suffering to any individual and the court cannot say that the award here based on the consequences suffered by the plaintiff shocks the conscience.
The federal punitive damage award, though large and though both federal claims were based on the same matrix of facts, represented what this jury as representatives of the community determined should be a consequence for a violation of the defendant's rights. The court believes a jury is uniquely fit to determine damages of this type since they are explicitly told in the charge that such damages should serve as a warning or example for others not to engage in wrongful conduct. A citizen jury is well-equipped to determine the parameters of any such lesson setting function when it involves transgressions they have found a governmental unit or agent has committed. A trial court should be reluctant to set such damages aside or reduce them given the fact that there are absolutely no guidelines to be used in doing so except the judge's personal predilections as to what would be fair or appropriate. The court declines to remit any of the awards.
(3)
PUNITIVE DAMAGES ON STATE LAW CLAIMS CT Page 5106
The jury awarded punitive damages in the state law violation claims and it was left to the court to determine those damages. In Connecticut, punitive damages are limited to a party's litigation costs. In this case, the plaintiff had a retainer agreement with counsel providing that the fee would be 40% of any recovery. In light of the court's instructions on how state and federal punitive damages were to be calculated by the jury the court tends to agree that if the retainer agreement were to be used to determine the amount of state punitive damages there would be a double recovery or at least the danger of such a recovery being imposed without any fair way to determine if in fact that were the case.
If cost of litigation were used to determine state punitive damages — hours spent times fair hourly rate — this problem would be avoided. That is in the instructions on punitive damages for the federal constitutional claims the jury was not told that litigation expenses could be taken into account by them.
What do the cases say about calculating the cost of litigation when there is a contingency fee retainer agreement?
In Berry v. Loisseau, 223 Conn. 786 (1992), the trial court had awarded the plaintiff as punitive damages one-third of the plaintiff's recovery based on the client s contingency fee agreement with his lawyer. The trial court felt bound to take this approach by the provisions of § 57-251c(b) of the General Statutes. Id. p. 830. The Supreme Court held that the trial court improperly concluded that this statute controlled the amount of the plaintiff's punitive damage award. Id. p. 831. The court went on to note that the court had previously upheld punitive damage awards computed on the basis of a plaintiff's contingency fee agreement with his or her lawyer. See, for example, Markey v.Santangelo, 195 Conn. 76, 80 (1985). But once evidence of a contingency fee agreement is presented the trial court is not required to award punitive damages according to that agreement's terms. Thus, the court said at page 831:
 . . . [T]he admission of a written fee agreement as evidence of the plaintiff's litigation expenses is in accord with Connecticut practice . . . Thus, on remand, the trial court may properly consider the terms of the plaintiff's fee agreement in assessing the amount of punitive damages to be awarded. CT Page 5107
Id. p. 831.
"May consider" is very far from "must accept."
Thus, in Markey v. Santangelo, supra, the court upheld the trial court's award of punitive damages in the amount of the contingency fee agreement but the court went on to say:
 We have long held that in a claim for damages "proof of the expenses paid or incurred" affords some evidence of the value of the services, and if unreasonableness in amount does not appear from other evidence or through application of the trier's general knowledge of the subject matter, its reasonableness will be presumed . . .
195 Conn. at p. 80.
Before turning to the specific claims and appropriate actual award in this case, the court will make two observations. First, the award for state punitive damages should take into account solely the cost of litigation incurred to advance the state claims. What makes that proposition difficult to effectuate here is that the state and federal claims are inextricably bound not only factually but legally. Thus, federal malicious prosecution is basically the equivalent of state malicious prosecution and, since this case involves a warrant arrest, those two claims involve many issues that arise in the prosecution of the federal false arrest claim. It is hard to parcel out in any meaningful manner how much time an attorney could be said to have spent prosecuting one set of claims as opposed to another set of claims.
Second, it seems to the court that if the plaintiff is to be compensated at some point for litigation expenses in pursuing the federal claims, in light of the just mentioned factors, the court at the end of these proceedings should be careful not to make a double award for the costs of litigation.
The court has examined the material submitted to it. In light of previous estimates of hourly rates of compensation submitted to other courts by plaintiff s counsel and other members of his firm and positions held in that firm by these respective lawyers and their years of experience, the court concludes a fair hourly CT Page 5108 rate of compensation would be $150 per hour. There is also a claim that 248.80 hours was the amount of time spent on this trial. The defendants dispute a large portion of the claimed hours. The proper question is what would be the reasonable amount of hours spent in working on the case and what factors should be considered in determining that. The just quoted language from theMarkey v. Santangelo case would seem to allow our courts to adopt the practice of the federal courts under Title 42, § 1988 of the U.S. Code. In the case of Blanchard v. Bergeron, 489 U.S. 87, 92
(1989). the court said the following in referring to the guidelines set forth in an earlier case where a contingency fee is involved:
 The Johnson contingency-fee factor is simply that, a factor. The presence of a pre-existing fee agreement may be aid in determining reasonableness. "The fee quoted to the client or the percentage of the recovery agreed to is helpful in demonstrating the attorneys fee expectations when he accepted the case." Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 483 U.S. 711, 723 (1987) quoting Johnson, 488 F.2d, at 718. But as we see it, a contingent — fee contract does not impose an automatic ceiling on an award of attorneys fees, and to hold otherwise would be inconsistent with the statute and its policy and purpose.
 As we understand § 1988's provision for allowing a "reasonable attorneys fee," it contemplates reasonable compensation, in light of all of the circumstances, for the time and effort expended by the attorney for the prevailing plaintiff, no more or less. Should a fee agreement provide less than a reasonable fee calculated in this manner, the defendant should nevertheless be required to pay the higher amount. The defendant is not, however, required to pay the amount called for in a contingent-fee contract if it is more than a reasonable fee calculated in the usual way.
The case of Johnson v. Georgia Highway Express, Inc.,488 F.2d 714 (CA 5, 1974), sets out various factors that courts should take into consideration. There is a discussion of various categories at pages 717 through 719 with commentary on how to apply the categories which are: (1) the time and labor required; CT Page 5109 (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent: (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.
In this case no extensive or complicated pretrial discovery was conducted and the facts were not complex. The jury selection process was fairly lengthy but that is not surprising in a case of this type; the trial was of moderate length and on a few of the days a full seven hour day was not put in by the court and the parties. It cannot be said that novel legal issues were presented except perhaps as to the post-trial jury matter. There was a contingent fee arrangement here of 40% but the "results obtained" on the state claim were only some incalculable portion of the $100,000 compensatory damage award since such an award was also made on the federal claims. The federal punitive damages award cannot be taken into account on the determination of state punitive damages.
The reasonable amount of time for the prosecution of the state claims is, in the court's view, 200 hours. If the hourly rate of $150 is then used, the appropriate cost of litigation would then be $30,000. The application of the Johnson factors do not require a different result. This would not preclude the court from awarding additional attorneys fees on the federal claims but that is not before me at the present time.
CONCLUSION
The court will deny the defendants' post trial motions and has determined state punitive damages should be awarded as indicated.
CORRADINO, J.